591 S.E.2d 260

**JOHN P.W., on Behalf of ADAM and Derek W., Petitioner Below, Appellee**

v.

**DAWN D.O., Respondent Below, Appellant.**

No. 31155.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 18, 2003.

Decided Dec. 4, 2003.

---

Thomas G. Dyer, Mary Guy Dyer, Dyer Law Offices, Clarksburg, for the Appellee.

Shannon R. Thomas, Weston, for the Appellant.

ALBRIGHT, Justice:

Dawn D.O.[1] appeals from the April 15, 2002, decision of the Circuit Court of Harrison County affirming the domestic violence protective order that the Harrison County Family Court Judge issued against her upon the petition of Appellee John P.W. Appellant challenges the issuance of that protective order, arguing that the statutory grounds for its issuance were not met and that the circuit court failed to afford her a hearing in connection with her appeal of the order. Upon a full review of the record in this matter, we find that error was committed by the family court judge's wrongful issuance of the protective order and further find that Appellant was denied her statutory right to a hearing in connection with her appeal. Accordingly, we reverse.

## I. Factual and Procedural Background

The parties were married in 1984 and during the course of their marriage, two sons were born:[2] Adam, who is currently 16, and Derek, who is currently 13. Following their divorce on December 2, 1996, the parties jointly shared custody of their sons. Pursuant to this custody arrangement, they each had physical custody of the children fifty percent of the time and jointly shared all parenting decisions.

From a very early point, there were problems with the shared custody arrangement.[3] The record reflects that the parties and their children were engaged in periodic counseling in an attempt to resolve various issues that surfaced over the years and that several modification orders were entered with respect to the original joint parenting agreement. On August 24, 2001, Appellee filed a

---

1. As is our custom in cases involving sensitive matters, we identify the parties by initials only.

2. Adam was born on November 12, 1987, and Derek was born on December 18, 1990.

3. This is evidenced by the fact that Appellant filed a motion seeking a modification of custody through which she sought sole custody of the

boys on October 1, 1997. This matter was not heard by the court, however, as Appellee filed a response to the modification motion, stating that the parties had agreed through the joint parenting agreement, which they executed in connection with their divorce decree, to initially seek resolution of disputes through counseling and mediation before involving the court.

motion seeking a modification of custody based upon the desires of Adam, who would turn fourteen in a matter of months. Through this motion, Appellee sought to have Adam reside exclusively with him and to "visit with the Respondent [Appellant] only upon the mutual agreement of the infant child and the Respondent [Appellee]." By order entered on February 1, 2002, the family court made Appellee the primary physical custodian of Adam and provided for bi-monthly weekend visitation between Adam and Appellant.[4]

On March 17, 2002, an altercation between Adam and Appellant occurred as Adam was leaving his mother's residence following a weekend visitation. Adam had attempted to take certain expensive items of sports memorabilia from Appellant's home without her consent.[5] When Appellant confronted Adam about taking the items, which she had purchased for him and intended to remain in his room at her house, he left the items and exited angrily from the house, slamming the door upon leaving. In response to Appellant's attempt to speak with him about sneaking things out of the house, Adam was allegedly verbally abusive to his mother, saying "no" in response to her request that he talk to her, and following that comment with "[w]hat are you going to do about it?" At this point, Appellant apparently ran after Adam, and grabbed his shirt. He managed to slip out of his shirt and Appellant then grabbed her son by the back of his pants trying to pull him back. While the facts are disputed as far as the severity of the physical harm inflicted upon Adam, he was allegedly scratched and/or bruised in the process of the struggle that ensued with his mother.[6]

During the entirety of the incident, Appellee observed the struggle while sitting in his van, which was parked in Appellant's driveway.[7] While in the van, Appellee, who is the chief of police of a local community, made a 911 call to which a police cruiser responded. The responding officer, Michael J. Limley, took statements from Appellant, Appellee, and Adam.[8] He took pictures of Adam as well.[9] Appellant and Adam went to the Harrison County Magistrate Court on the date of the incident and obtained a temporary domestic violence order. Pursuant to this emergency order, Adam and Derek were removed from Appellant's care and Appellee was awarded temporary custody of the children with no visitation or contact provided to Appellant.

On March 25, 2002, a hearing on the domestic violence petition was held before Family Court Judge M. Drew Crislip. Testimony was taken from Officer Limley, Dr. George Moses, a treating counselor, and Sharon Johnson, a co-worker and friend of Appellant.[10] With regard to the facts of the incident, the family court judge simply read into the record the domestic violence petition

4. The record suggests that this arrangement was in place beginning sometime in January 2002, following the recommendation of Stephen O'Keefe, a psychologist who was counseling the parties at the time. As far as Derek, the joint custody arrangement was continued under the February 1, 2002, order, with two additional days per month of visitation time extended to Appellee.

5. These items were a framed Alan Iverson jersey and a Pittsburgh plaque.

6. Appellee claims that Appellant also hit Adam on the back four times and tried to choke him. Appellant denies that she hit Adam and says she put her hands on his cheeks, trying to turn his face around to her, but did not attempt to choke him.

7. Derek was present during part of the incident, but went inside the house at some point upon the instruction of his stepfather.

8. Officer Limley filed a criminal complaint against Appellant the next day for domestic battery. Appellant was arrested, released on her own recognizance, and following a trial on July 31, 2002, was found not guilty of this charge by the jury.

9. With regard to what physical evidence of injury Adam had, Officer Limley testified that: "He had some scratches on each side of his abdomen. One of them was up a little bit higher on one of his sides. And then he had two red marks up here, but nothing that really indicated any injury around his neck."

10. Ms. Johnson was present when Derek was removed from Appellant's house around 7 p.m. on the date of the incident, following the issuance of the temporary domestic violence order.

filed by Appellee and the response that Appellant filed to the petition. Although a child protective services worker, Mary Nicholson, appeared to testify, she left without giving testimony due to the illness of her child. Before leaving, however, she gave the family court judge her opinion that the restraint used during the incident by Appellant was excessive, though she declined to give a recommendation due to the incompleteness of her investigation.[11]

During the course of the hearing, the family court judge found that domestic violence had occurred based on the sole factual finding that Appellant "exceeded the bounds of propriety in attempting to discipline the parties' son, Adam." In issuing the domestic violence protective order, the family court judge granted Appellee custody of both Adam and Derek; provided for visitation between Adam and his mother "only as Adam wishes;" and set up supervised visitation between Derek and Appellant, that was to occur every other weekend.

Appellant timely filed her appeal of the ruling issued by the family court judge on April 8, 2002. Without providing any hearing to Appellant on her appeal, the circuit court issued its ruling on April 15, 2002, in which it affirmed the family court's issuance of the domestic violence protective order. In its ruling, the circuit court found no error, holding that Appellee had shown domestic violence by a preponderance of the evidence and that the family court judge "did not disregard the best interests of the parties' other infant son, Derek W[.], in granting custody of him to" Appellee. Through this appeal, Appellant seeks a reversal of the domestic violence protective order.

## II. Standard of Review

■ Our standard of review is the same as that of the circuit court which is set forth in West Virginia Code § 48–27–510(d) (Supp. 2003): "The standard of review of findings of fact made by the family court is clearly erro-

neous and the standard of review of application of the law to the facts is an abuse of discretion standard." Consequently, upon an appeal from a domestic violence protective order, this Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*. With these standards in mind, we proceed to determine if the lower court committed error in affirming the decision of the family court judge.

## III. Discussion

### A. Domestic Violence Finding

Appellant argues that the circuit court committed error in finding that domestic violence was proven on the facts of this case. Domestic violence is specifically defined by statute as requiring the commission of one or more of the following acts between "family or household members":[12]

(1) Attempting to cause or intentionally, knowingly or recklessly causing physical harm to another with or without dangerous or deadly weapons;

(2) Placing another in reasonable apprehension of physical harm;

(3) Creating fear of physical harm by harassment, psychological abuse or threatening acts;

(4) Committing either sexual assault or sexual abuse as those terms are defined in articles eight-b [§§ 61–8B–1 et seq. and 61–8D–1 et seq.] and eight-d, chapter sixty-one of this code; and

(5) Holding, confining, detaining or abducting another person against that person's will.

W.Va.Code § 48–27–202 (2001).

Appellant maintains that none of the acts defined as constituting domestic violence applies in this case and, further, that the family court judge did not make a specific finding

---

11. The family court judge placed on the record a report of his conversation with Ms. Nicholson. Specifically, he stated that she told him that Appellant had "engaged in—in excessive force, inappropriate conduct with regard to the child, Adam, on this occasion."

12. Those persons qualifying as family or household members are defined in West Virginia Code § 48–27–204 (Supp.2003).

that any one of these qualifying acts was demonstrated by the evidence. The only finding contained in the protective order was that "Respondent [Appellant] exceeded the bounds of propriety in attempting to discipline the parties' son, Adam, in the presence of Petitioner [Appellee] and the parties' other son, Derek."

■ In response to Appellant's arguments that domestic violence was not shown, Appellee contends that the proffered evidence could be viewed as having demonstrated the occurrence of physical harm; that Adam was placed in "reasonable apprehension of physical harm," and that Appellant had held, confined, or detained Adam against his will. *See* W.Va.Code § 48–27–202(1), (2), (5). Because there is no finding by the family court judge as to which definition of domestic violence he was relying upon to issue the protective order, we are without any basis from which to review his ruling other than to look at the statutory definitions to determine whether the evidence presented demonstrates an act which qualifies as domestic violence under the statute. *See* W.Va.Code § 48–27–202. To avoid this problem in the future and to allow proper judicial review, we hold that a family court judge who issues a domestic violence protective order is required to make factual findings which describe the acts of domestic violence that have been established by the evidence presented and to identify which statutory definition of domestic violence such facts demonstrate.

■ For purposes of this appeal, we will examine the three definitions of domestic violence upon which Appellee relies to argue that the family court could have been relying upon in making its ruling. *See* W.Va.Code § 48–27–202(1), (2), (5). While Appellee views the record as conclusively demonstrating physical harm, based on photographs evidencing several scratch marks, we do not reach the same conclusion. We have carefully scrutinized the submitted photographs that Officer Limley took of Adam and we can barely discern the referenced scratch marks; we are completely unable to detect any red marks in the neck area. While we do not go so far as to hold that physical harm which does not require medical attention [13] cannot qualify as domestic violence under the statute, in this case we do not find sufficient evidence of physical harm to meet the definition of domestic violence. Moreover, there is no finding by the family court judge that physical harm was inflicted upon Adam.

In similar conclusory fashion, Appellee makes the presumption that Adam was placed in "reasonable apprehension of physical harm." W.Va.Code § 48–27–202(2). Based on Adam's plea for "help" from his father who was sitting in a vehicle in the driveway, Appellee argues that the requisite fear of harm was demonstrated. Appellant notes that Adam never told Officer Limley that he was afraid.[14] And, even the family court judge recognized that "the fact that his [Adam's] father was there and he knew that his father would be supportive and in disagreement with his mother is a factor that is worthy of consideration." Dr. Moses testified that there had been no past incidents of physical harm involving Appellant with either of her children.[15] Without any testimony or statement from Adam that he was in fear of being harmed by his mother during this incident, we find the record devoid of evidence sufficient to meet the "reasonable apprehension of fear" definition of domestic violence under the statute at issue. *See id.*

■ The final basis upon which Appellee relies to assert domestic violence is the most disconcerting. To suggest that Appellant's attempt to hold or detain her child while she was attempting to speak with him about the deceptive and disrespectful conduct she caught him in the midst of carrying out is tantamount to suggesting that every parent

**13.** There is no dispute that Adam did not require any medical attention in connection with his alleged injuries.

**14.** When specifically asked during the March 25, 2002, hearing whether Adam told him that he was afraid of his mother, Officer Limley testified, "no."

**15.** When questioned as to whether Derek should be removed from Appellant's physical custody based on this singular incident, Dr. Moses said no and indicated that Derek had no basis for fearing he would be harmed by his mother.

who attempts to temporarily restrain their child while in the course of discussing inappropriate behavior is committing domestic violence.[16] We do not think the Legislature intended that the statutory definition of "holding, confining, [or] detaining" be applied to everyday instances of parental discipline.[17] Upon reflection, the terms used to convey this definition of domestic violence suggests that a temporal component is involved in qualifying factual instances. In this Court's opinion, to constitute domestic violence under the statutory definition of "holding, confining, detaining or abducting another person against that person's will" within the meaning of West Virginia Code § 48–27–202(5), a parent's alleged act of domestic violence toward his or her child should, as a general rule, take place over a temporally significant period and not be the momentary act of a parent in the midst of attempting to control a child within the proper boundaries of parental control. See *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (recognizing that "parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society").

While there are clear exceptions to the broad authority afforded parents in rearing their children, such as those situations where a child's "physical or mental health is jeopardized," the evidence presented in this case does not rise to that level. *Parham v. J.R.*, 442 U.S. 584, 603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). The Legislature was clear in its expression of the objectives underlying the enactment of the Domestic Violence statutes.[18] See W.Va.Code § 48–27–101. Significantly, there is no language set forth in those statutory provisions that seeks to abrogate the right of a parent to exercise control over his or her child in the context of child rearing. It is beyond dispute that the concerns which underlie the enactment of the Domestic Violence statutes are deserving of serious attention and consequently demand the highest protections the law can afford. What is equally true, however, is that the law cannot countenance an attempt to cloak as domestic violence acts that clearly were not contemplated by the Legislature to fall within the parameters of these statutes.

---

**16.** Even the family court judge acknowledged the possibility that "if . . . [Appellant] was attempting to discipline him [Adam] and he was resistant and . . . she was attempting appropriately to restrain him and he, in the—in the course of that, was injured, that's not domestic violence."

**17.** To be clear, we are not condoning the infliction of physical harm during the course of parental discipline or child rearing. And, we are similarly not attempting to say that domestic violence can never result during the course of parental discipline. We are merely trying to distinguish between those acts of parental control for which the state cannot interfere based on the recognized liberty interest parents have in raising their children and those instances where the state's interest in protecting a child's welfare justifies intervention. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *accord Troxel v. Granville*, 530 U.S. 57, 65–66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (stating that "[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court" and observing that "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children").

**18.** Through the enactment of the Domestic Violence statutes, the Legislature sought to achieve the following objectives:

(1) To assure victims of domestic violence the maximum protection from abuse that the law can provide;
(2) To create a speedy remedy to discourage violence against family or household members with whom the perpetrator of domestic violence has continuing contact;
(3) To expand the ability of law-enforcement officers to assist victims, to enforce the domestic violence law more effectively, and to prevent further abuse;
(4) To facilitate equal enforcement of criminal law by deterring and punishing violence against family and household members as diligently as violence committed against strangers;
(5) To recognize that domestic violence constitutes serious criminal behavior with potentially tragic results and that it will no longer be excused or tolerated; and
(6) To recognize that the existence of a former or on-going familial or other relationship should not serve to excuse, explain or mitigate acts of domestic violence which are otherwise punishable as crimes under the laws of this state.

W.Va.Code § 48–27–101(4)(b).

We simply cannot accept Appellee's contention that the acts committed by Appellant on the date in question "escalated into abuse." In addition to the questionable evidence of physical harm, there is no finding by the family court judge in the protective order of any act which qualifies as domestic violence. We cannot by any stretch of the imagination view the Family Court's finding that Appellant "exceeded the bounds of propriety in attempting to discipline" her child as sufficient to constitute an act of domestic violence under the provisions of West Virginia Code § 48–27–202.[19] Finding no statutory basis for the issuance of the domestic violence protective order, we conclude that the circuit court abused its discretion in upholding the issuance of that order by the family court upon the facts of this case.

### B. Fostering Parental Contact

It saddens this Court that Appellant, as a result of the filing of the underlying domestic violence petition on the facts of this case, has lost valuable contact with both of her sons.[20] With the exception of Appellee, almost everyone else involved in this matter recognizes the role that John P.W. has played with regards to the deteriorating relationship Appellant has experienced with her two sons.[21] The first counselor who treated the children, Dr. Moses, validated Appellant's concerns [22] with his finding after the very first session that "something was happening that was making it difficult for the boys to trust their mother." After examining Appellee in October of 2001, Dr. O'Keefe included in his findings that "[h]e should encourage his children to visit with their mother and should be reminded not to say or do anything in front of the children that may have a negative impact on the relationship of the boys and their mother." The trial court acknowledged that Adam "should listen to his mother. He's not doing so." And, as discussed above, the trial court clearly acknowledged that Adam was fully aware that his father would be supportive of his actions in pulling away from his mother and in being disrespectful of her request that he talk to her during the altercation that is at the center of this matter.[23]

While this Court is to a great extent powerless to alter the attitudes of recalcitrant adults on the all important issue of encouraging children to maintain a relationship with their non-custodial parent, we would be remiss if we failed to acknowledge the potential harm that will result from a parental relationship that is effectively allowed or encouraged to be extinguished. Children need the support, love, and encouragement of both parents when those parents are available, as any child psychologist will readily attest. The parent who has physical custody of children in a divorce setting has the best opportunity and indeed has an obligation as a parent who is supposed to be acting in the best interests of his child to encourage contact and foster visitation with the non-custodial parent, barring reasonable cause to believe that such visitation will put the child in jeopardy of harm. To act otherwise, is clearly to deny that child a critical part of his

**19.** Moreover, it is particularly telling when the Family Court Judge admits on the record that if the parties were married the acts complained of would not constitute domestic violence.

**20.** During the oral argument of this case, it was represented that since March 2003, the only contact between Appellant and her sons has been in the form of cards and letters. While Appellee criticized her for not initiating any telephone contact with her sons during this same period, Appellant's counsel represented that the children refuse to talk to her when she calls.

**21.** We are greatly troubled by the fact that prior to the March 17, 2002, incident there was no evidence of any problems between Appellant and Derek. ' As a result of the family court judge's decision first to take Derek away from his moth-

er where there was no evidence of harm or likelihood of harm to him and then to require supervised visitation between Appellant and Derek against the recommendation of the treating counselor, Dr. Moses, the family court's actions clearly appear to have contributed to the demise of a parental/child relationship that was previously not experiencing any trouble.

**22.** Appellant had expressed concern to Dr. Moses that Appellee "was contributing to ... alienation [that she was experiencing] and was making it difficult for she and Adam, in particular, but both boys to get along with."

**23.** Had Adam just stopped to talk to his mother upon her request, it seems probable that the physical aspect of the incident would never have transpired.

development and to deny the non-custodial parent her liberty interest in guiding the child to adulthood.

■ The United States Supreme Court recognized in *Parham* that

[t]he law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

442 U.S. at 602, 99 S.Ct. 2493 (citing 1 W. Blackstone, Commentaries * 447, 2 J. Kent, Commentaries on American Law * 190). While parents are accorded great deference in child rearing matters, their right to raise their children without intervention of the state is clearly linked to this recognition that in most instances a parent will act in the best interests of their children. *See* Syl. Pt. 4, *Lindsie D.L. v. Richard W.S.*, 214 W.Va. 750, 591 S.E.2d 308, 2003 WL 22871730, No. 31562 (Dec. 4, 2003) (holding that "[t]here is a presumption that fit parents act in the best interests of their children"). When one parent discourages a child from maintaining a relationship with the other parent where there are no legitimate concerns regarding the child's physical or mental welfare, that parent is undeniably failing to act in the child's best interests and disregarding the "high duty" of preparing their child for life's "additional obligations." *Parham*, 442 U.S. at 602, 99 S.Ct. 2493 (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)).

Through our ruling in this case we are not asked to, nor do we seek to, disturb the modified parenting plan that the parties entered into on April 10, 2003. Pursuant to that plan, which included the participation of a guardian ad litem, Appellee is the primary residential parent of the parties' children and Appellant is permitted "parenting time with either child as the child desires and requests and/or as recommended by the children's counselor, Nancy Rush." Counseling was to occur with Ms. Rush during the initial six month period of this plan, and at the end of such time period, Ms. Rush was to file a

report with the family court regarding the participation of the parties in counseling and her recommendations as far as visitation. While we are certainly pleased to see that the parenting plan instructs, "[b]oth parties ... [to] encourage parenting time and contact between the children and mother," the realities suggest that the mandated encouragement may not be forthcoming. *See supra* note 20. Admittedly, issues of visitation are not before us today. We simply wish to encourage the fostering of a positive relationship between these boys and their mother.

## C. Denial of Hearing

As an additional ground for her appeal, Appellant raises the fact that the circuit court did not extend to her a hearing in connection with her appeal from the issuance of the domestic violence protective order. Under the provisions of West Virginia Code § 48–27–510 (Supp.2003),

(b) Any party to a protective order entered upon final hearing may file a petition for appeal, within ten days of the entry of the order in family court, to the circuit court. The order shall remain in effect pending an appeal unless stayed by order of the family court sua sponte or upon motion of a party, or by order of the circuit court upon motion of a party. No bond shall be required for any appeal under this section.

(c) A petition for appeal filed pursuant to this section shall be heard by the court within ten days from the filing of the petition.

W.Va.Code § 48–27–510(b), (c).

■ The record confirms that Appellant was denied an opportunity to appear before the circuit court to present argument in connection with her appeal from the domestic violence protective order. The statutory language "shall be heard" that is set forth in West Virginia Code § 48–27–510(c) (Supp. 2003) connotes in mandatory terms the obligation of the circuit court to afford a petitioner seeking relief from a domestic violence protective order the opportunity to appear and present argument in person in connection with a timely filed appeal unless affirmatively waived by the appealing party. In this

case, the circuit court denied Appellant her statutory right to have her day in court. Although the circuit court committed error in failing to afford Appellant a hearing, there is no reason to remand this matter for the purposes of holding such a hearing based on our decision that the protective order was improperly issued.

Based on the foregoing, the decision of the Circuit Court of Harrison County is hereby reversed.

Reversed.