The Circuit Court granted UPW's motion to set aside the entry of default against UPW "on the condition that UPW pay necessary and reasonable fees and costs to [Lee] for the time [Lee] spent to prepare for and attend her motion for entry of default judgment as against UPW." The record indicates that Lee's counsel expended 7.4 hours (valued at $1,480) in connection with the motion for entry of default judgment that Lee filed against both the State and UPW. Lee argues that "[t]he same services were expended and incurred in preparing, filing, and appearing at the hearing [on the motion][,]" that the same proof was required against both UPW and the State, and that the State was mentioned "at most[ ] five times" in the pleading.

However, Lee's motion for entry of default judgment was filed against both UPW and the State. Lee stipulated with the State that the entry of default against the State would be set aside without requiring the State to pay any attorney's fees. Under these circumstances, we cannot say that the Circuit Court abused its discretion in limiting its award of attorney's fees against UPW and in favor of Lee to $740, an amount reflecting one-half of the time that Lee's attorney spent on the motion for entry of default judgment that Lee filed against both the State and UPW.

## CONCLUSION

We hold that the Circuit Court properly dismissed Lee's complaint against UPW and the State for lack of jurisdiction. We therefore affirm the Circuit Court's January 24, 2007, Judgment. We also hold that the Circuit Court did not abuse its discretion in limiting its award of attorney's fees against UPW to $740. We therefore affirm (1) the Circuit Court's November 15, 2006, order awarding Lee attorney's fees and costs against UPW; and (2) its January 17, 2007, order denying Lee's motion to alter, amend, or revise the award of attorneys' fees.

260 P.3d 1148

**Lily E. HAMILTON on behalf of Amber J. LETHEM, a minor, Plaintiff–Appellee,**

v.

**Christy L. LETHEM, Defendant–Appellant.**

**No. 27580.**

Intermediate Court of Appeals of Hawai'i.

June 30, 2011.

Christy L. Lethem, on the briefs, pro se Defendant–Appellant (Robert H. Thomas, later appearing as appellate counsel).

Stephen T. Hioki, on the briefs, for Plaintiff–Appellee.

FOLEY, presiding, LEONARD and REIFURTH, JJ.

Opinion of the Court by LEONARD, J.

Defendant–Appellant Christy L. Lethem (**Father**) appeals from the Ex Parte Temporary Restraining Order (**Ex Parte TRO**) filed September 23, 2005, and the Order Regarding Temporary Restraining Order filed October 5, 2005 (**Order**), both entered by the Family Court of the First Circuit (**Family Court**).[1] Plaintiff–Appellee Lily E. Hamilton (**Mother**) obtained the Ex Parte TRO against Father on behalf of the parties' minor child (**Minor**), alleging acts of physical and emotional abuse. Following a hearing held on October 5, 2005, the Family Court entered the Order allowing the Ex Parte TRO to remain in effect until its expiration on December 22, 2005.

Appearing pro se on appeal, Father argues that (1) the Family Court's application of Hawaii Revised Statutes (**HRS**) Chapter 586, providing for ex parte temporary restraining orders (**TROs**) and orders for protection arising from domestic abuse, unconstitutionally infringes on parental rights and violates constitutional guarantees of due process; (2) the process for obtaining an ex parte TRO is unconstitutionally gender-biased; and (3) the Family Court abused its discretion in finding that past acts of abuse occurred. On remand from the Hawai'i Supreme Court's opinion in *Hamilton ex rel. Lethem v. Lethem,* 119 Hawai'i 1, 193 P.3d 839 (2008), we now conclude that Father's arguments are without merit and affirm.

1. The Honorable Darryl Y.C. Choy presided.

## I. BACKGROUND

### A. *Ex Parte TRO*

On September 23, 2005, Mother filed an Ex Parte Petition for a Temporary Restraining Order for Protection and Statement (**Petition**) on behalf of Minor. The Petition was handwritten on a form pleading, with various blanks filled in and boxes checked off. It alleged that Father had "physically harmed, injured or assaulted me [Minor]" by "slapping, punching, hitting me." It indicated the last date of this occurrence as August 25, 2005. It alleged that Father had "threatened me [Minor] with physical harm, injury or assault by threatening to ... physically hurt me," the last date being August 25, 2005. The Petition further alleged that Father "subjected me [Minor] to extreme psychological abuse by showing up at my school unannounced, putting me down by blaming financial problems on me, and saying many problems (such as work problems/emotional distress) was [sic] my fault." (Punctuation altered.) The last date for this incident was September 16, 2005. The Petition alleged immediate danger of physical and psychological abuse based on Father's "previous actions such as hitting me [Minor] on Aug. 12th and Aug. 25th, showing up at my school, and verbally abusing me."

On September 23, 2005, the Family Court entered the Ex Parte TRO, prohibiting Father from having contact with Minor. The Ex Parte TRO was served on Father that afternoon along with a notice of the hearing scheduled for October 5, 2005.

### B. *The Evidentiary Hearing*

The Family Court held an evidentiary hearing regarding the Ex Parte TRO on October 5, 2005. Minor testified that she and Father had a visitation arrangement under which she spent time with him every week and stayed at his house every other weekend. She testified regarding three alleged acts of abuse:

1. On August 11, 2005, Father was scheduled to pick Minor up from school. Minor lied to Father, telling him that Mother would pick her up from school, but instead went with her friends to obtain a "morning-after"

contraceptive pill for one of her friends. Father became concerned when he could not locate Minor, but eventually picked her up from Mother's house. The following day, Father and Minor got into an argument about Minor's behavior. Minor told Father that he did not need to "get involved in the situation" because she had already spoken to her Mother about what had happened. Minor testified that "because I wouldn't tell him, he hit me for that, because I wouldn't talk." He hit her more than once during the argument. Minor described how she blocked his hand before it reached her face. She further testified that Father restrained her from calling Mother.

2. On August 25, 2005, Minor got into another argument and "power struggle" with Father. Father had tried to initiate a conversation with Minor, but she wanted to go to bed as it was late and she had school the next day. She further testified:

> We continued to argue. That's when he hit me. Like, as I was covering my head, like, he hit me on my arms. And then we started—once we ended the argument, he left the room. And I tried to get to bed, but then I ended up calling my mother and telling her that I—that I was uncomfortable being at my father's house anymore.

She testified that her Father told her, "Don't make me do that again.... Don't make me hit you again."

3. Around September 16, 2005, Father unexpectedly arrived at Minor's school during class hours. He pulled Minor out of class and "blam[ed] me [Minor] for financial problems and [said] how a lot of the things were my fault ... and that he was going to pull me out of school and that—that all of this was going to end and stuff." Father told Minor that her younger sister was "better than [Minor] in this way and this way." Minor felt that he was emotionally "getting to me and that it wasn't right at all."

In support of the Ex Parte TRO, Minor testified that she felt she was in immediate danger because "[Father] hit me previous times before, and I feel like he could hit me in the future or physically harm me in the future because of actions in the past."

Father also testified. He described his strained relationship with Minor and explained the frequent disciplinary struggles that arose from her repeated rule-breaking and misbehavior. He described each of the three incidents of alleged abuse as follows:

1. On August 11, 2005, Father became very concerned when he realized Minor had lied to him and he was unable to locate her. The next morning, he tried to confront Minor about her behavior. She became very upset and was "screaming and yelling" and "ranting and raving." At one point, Minor tried to stand up, and Father slapped her on the shoulder. He testified that he "would not hit her in the face."

2. On August 25, 2005, Father picked Minor up from school. He had not seen her for several days and wanted to talk with her and "catch up." Minor did not want to talk and accused him of interrogating her. Several hours later, Father tried to initiate a conversation and they began to argue. When Minor tried to stand up, Father "reached across to sit her back down." He denied threatening to hit her.

3. On September 16, 2005, Father picked Minor up after school, as Minor had arranged to stay at his house for the weekend. When Father arrived at school, Minor told him she had changed her mind and decided not to stay with him. Father waited with Minor until Mother arrived to bring her home from school.

Father also testified that on one or two prior occasions, he went to Minor's school to "sit down with [Minor] and discuss the issues with her" in a counseling context. He denied ever blaming financial or emotional problems on Minor.

Father testified that any physical force or contact with Minor was employed solely to "get her attention" and "not to hurt her." Finally, he testified that on the day he was served with the Ex Parte TRO, Minor called him to ask for a favor and she was in a good mood.

## C. *The Order; Findings of Fact and Conclusions of Law*

On October 5, 2005, the Family Court entered the Order determining that "[f]or good

cause shown, The Court shall take no further action." It directed the TRO to remain in effect until December 22, 2005.

On March 31, 2006, the Family Court entered the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. The defendant is [Minor's] father. Petitioner is [Minor's] mother and has sole legal and physical custody. The defendant has visitation rights. Both petitioner and defendant have been involved in a protracted and ongoing custody dispute.

2. In the weeks prior to August 25, 2005, [Minor] had helped a sexually active friend and classmate obtain a birth control product. When the defendant learned of [Minor's] involvement, he became quite upset. Protracted arguments took place between the defendant and [Minor].

3. At approximately 11:00 p.m. on the evening of August 25, 2005, [Minor] was visiting with the defendant and had just completed her homework. Since the following day was a school day, she wanted to turn in for the night. The defendant came to her room and demanded that they continue their unresolved discussion over her helping a friend obtain a birth control product. [Minor] refused to continue the discussion and stated that she was tired and wanted to go to bed. A loud argument ensued which ended with the defendant striking [Minor] and threatening her with further physical harm.

### CONCLUSIONS OF LAW

The material allegations of the petition have been proven. The defendant is the father of [Minor] and the statutory blood relationship has been established. The defendant did physically harm, injured or assaulted [sic] [Minor] by striking her on August 25, 2005 and by threatening her with further physical harm.

The defendant has raised parental discipline under section 703–309(a) HRS. However, that section applies to criminal not civil actions. Moreover, while it would appear that [Minor] was disciplined by the defendant for assisting her friend with obtaining a birth control product, discipline over issues of morals lies with the petitioner, who has sole legal and physical custody. Assuming additionally that the defendant struck [Minor] because of her refusal to discuss this issue late during a school night, the court concludes that such an action is not proper parental discipline.

The court, therefore, concludes that the allegations in support of the Temporary Restraining Order have been proved and that allowing the order to remain in full force and effect until the set expiration date of December 22, 2005 as requested by the petitioner is justified.

Father timely filed a timely notice of appeal.

### D. Previous Appellate Disposition

In a summary disposition order issued on May 16, 2008, this court concluded that Father's appeal was moot because the Ex Parte TRO expired on December 22, 2005, precluding an effective remedy on appeal. *Hamilton ex rel. Lethem v. Lethem*, No. 27580, 2008 WL 2069780, at *3 (App. May 16, 2008) (**SDO**). On writ of certiorari, the Hawai'i Supreme Court held that the issuance of the TRO fell within the "collateral consequences" exception to the mootness doctrine. *Hamilton*, 119 Hawai'i at 11, 193 P.3d at 849. It based this holding on the "reasonable possibility" that the TRO could cause continuing harm to Father's reputation. *Id.* Accordingly, it vacated the Intermediate Court of Appeal's (**ICA**) June 23, 2008 Judgment on Appeal and remanded "with instructions to address the merits of Father's case." *Id.* at 12, 193 P.3d at 850.

## II. POINTS OF ERROR

■ Father essentially raises the following points of error on appeal: [2]

---

2. Father's opening brief largely fails to conform to Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b). Generally, a party's "failure to comply with HRAP Rule 28(b)(4) [concerning points of error] is alone sufficient to affirm the [lower] court's judgment." *Morgan v. Planning Dep't, County of Kauai*, 104 Hawai'i 173, 180, 86 P.3d 982, 989 (2004). Nonetheless, this court observes a policy of affording pro se litigants the opportunity "to have their cases heard on the

(1) The Family Court's application of HRS Chapter 586 unconstitutionally infringes on parental rights to discipline and raise their children without government interference and violates constitutional guarantees of due process;

(2) The entire process for obtaining an ex parte TRO is unconstitutionally gender-biased; and

(3) The Family Court erred in finding that past acts of abuse occurred.

## III. *STANDARDS OF REVIEW*

We review a trial court's findings of fact (**FOFs**) under the clearly erroneous standard. *In re Doe,* 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001).

> A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Id.* (internal quotation marks, citations, and ellipsis omitted).

We review a trial court's conclusions of law (**COLs**) *de novo. Bhakta v. County of Maui,* 109 Hawai'i 198, 208, 124 P.3d 943, 953 (2005). "A COL is not binding upon an appellate court and is freely reviewable for its correctness. Moreover, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned." *Id.* (internal quotation marks, citations, and brackets in original omitted).

## IV. *DISCUSSION*

A. *HRS Chapter 586 Does Not Violate Procedural or Substantive Due Process*

Father argues that the Family Court's application of HRS Chapter 586 is unconstitu-

tional because it infringes on parental rights "to discipline and raise their children without governmental interference," and it violates constitutional guarantees of due process. We construe this point to implicate both a procedural and substantive due process challenge.

■ Hawai'i courts recognize a presumption that enactments of the Hawai'i Legislature are constitutional. Father therefore has the "burden of showing the alleged unconstitutionality beyond a reasonable doubt." *State v. Kam,* 69 Haw. 483, 496, 748 P.2d 372, 380 (1988); *accord State v. Adler,* 108 Hawai'i 169, 177, 118 P.3d 652, 660 (2005).

### 1. Substantive Due Process

The Fourteenth Amendment to the United States Constitution guarantees that "No State shall ... deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. The Hawai'i Constitution contains a similar due process clause in article 1, section 5 ("No person shall be deprived of life, liberty or property without due process of law[.]"). This guarantee encompasses two components of due process: procedural and substantive. *In re Doe,* 99 Hawai'i 522, 533 n. 14, 57 P.3d 447, 458 n. 14 (2002). We address each in turn.

■ Father alleges that the Family Court's grant of the TRO infringed on his constitutional right to discipline his child. Where a statute or state action implicates a fundamental right, strict scrutiny applies. *State v. Mallan,* 86 Hawai'i 440, 451, 950 P.2d 178, 189 (1998); *accord Coyle v. Compton,* 85 Hawai'i 197, 206, 940 P.2d 404, 413 (App.1997). Under strict scrutiny analysis, the state bears the burden of proving that the statute is narrowly drawn to advance a compelling state interest. *SCI Mgmt. Corp. v. Sims,* 101 Hawai'i 438, 460, 71 P.3d 389, 411 (2003). Where fundamental rights are not implicated, rational basis review applies. *Mallan,* 86 Hawai'i at 451, 950 P.2d at 189.

merits, where possible." *O'Connor v. Diocese of Honolulu,* 77 Hawai'i 383, 386, 885 P.2d 361, 364 (1994). Accordingly, we will consider Fa-

ther's arguments to the extent we can discern them.

The state action need only "rationally further a legitimate state interest." *Id.* (internal quotation marks and citation omitted). Thus, the threshold question is whether HRS Chapter 586 infringes upon a fundamental right.

Certain parental rights are protected under the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Troxel v. Granville,* 530 U.S. 57, 65–66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion); *In re Doe,* 99 Hawai'i at 532, 57 P.3d at 457. Parental rights are likewise secured under article 1, section 5 of the Hawai'i Constitution. *In re Doe,* 99 Hawai'i at 533, 57 P.3d at 458; *Doe v. Doe,* 116 Hawai'i 323, 334, 172 P.3d 1067, 1078 (2007); *State v. Matavale,* 115 Hawai'i 149, 158, 166 P.3d 322, 331 (2007). Foremost among them is the right to conceive and raise children, which the Supreme Court has recognized as an "essential, basic civil right[.]" *In re Doe,* 99 Hawai'i at 532, 57 P.3d at 457 (internal quotation marks and ellipses omitted) (quoting *Stanley,* 405 U.S. at 651, 92 S.Ct. 1208). Parents enjoy a fundamental liberty interest in the "care, custody, and control of their children." *Id.* (quoting *Troxel,* 530 U.S. at 65, 120 S.Ct. 2054 (plurality opinion)); *see also Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents[.]"); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (recognizing the "fundamental liberty interest of natural parents in the care, custody, and management of their child").

Nonetheless, parental rights are not unlimited in their scope. *Prince,* 321 U.S. at 166, 64 S.Ct. 438. Parents do not possess a fundamental right to discipline their children in any way they see fit. *See id.* at 167, 64 S.Ct. 438. Certainly they do not possess a

right to inflict severe bodily harm or extreme psychological injury on their children, even in the name of discipline. *See, e.g., State v. Crouser,* 81 Hawai'i 5, 15, 911 P.2d 725, 735 (1996) (recognizing that parents do not have constitutional right to inflict upon children "force that the legislature has deemed to be excessive and harmful to the child's welfare").

In a somewhat analogous case, the Hawai'i Supreme Court considered the contours of a respondent's constitutional right to freedom of movement. *Coyle,* 85 Hawai'i at 206–07, 940 P.2d at 413–14. There, the respondent alleged that the ex parte TRO issued under the domestic abuse statute infringed upon his fundamental right to freedom of movement. *Id.* at 206, 940 P.2d at 413. The supreme court recognized that although such a freedom is guaranteed under the Hawai'i Constitution, it is not absolute, but is subject to curtailment where it infringes upon the rights of others. *Id.* at 207, 940 P.2d at 414. The respondent did not have a "constitutionally protected right to remain free in [his] home after physically harming someone residing there." *Id.* (citation omitted). The court therefore concluded that the TRO did not "unreasonably infringe upon a defendant's freedom of movement." *Id.*

Although *Coyle* did not address the particular right asserted here, its analysis is applicable. Just as the right to freedom of movement is not absolute, so too the right of parents to discipline their children is not unlimited. *Matavale,* 115 Hawai'i at 158–59, 166 P.3d at 331–32 (noting that statutory-privilege to exercise physical force to discipline a child is not unlimited); *see also Sweaney v. Ada County, Idaho,* 119 F.3d 1385, 1391 (9th Cir.1997) (holding there is no clearly established constitutional right of parent to strike child for disciplinary purposes on public school grounds). Parents do not have a constitutional right to inflict excessive force upon their children as acts of discipline. *See Crouser,* 81 Hawai'i at 15, 911 P.2d at 735.[3]

---

3. In *Crouser,* the Hawai'i Supreme Court summarily rejected the respondent's argument that the parental justification defense under HRS § 703–309(1) (Supp.2001) was overbroad because it proscribed constitutionally protected

conduct. *Crouser,* 81 Hawai'i at 15, 911 P.2d at 735. The court noted that "[Defendant] points to no constitutional provision that protects his right to inflict upon a child, especially one not his own, force that the legislature has deemed to be

On its face, HRS Chapter 586 does not directly infringe upon the fundamental right of parents over the "care, custody, and control of their children." *In re Doe*, 99 Hawai'i at 532, 57 P.3d at 457 (internal quotation marks and citation omitted). It only applies to acts of "domestic abuse"—essentially acts or threats of "[p]hysical harm, bodily injury, assault," and extreme psychological abuse. HRS § 586-1.[4] As parents do not possess a fundamental right to inflict force or harm upon a child that "the legislature has deemed to be excessive and harmful to the child's welfare," rational basis review applies. *See Crouser*, 81 Hawai'i at 15, 911 P.2d at 735.

Under a rational basis review, the state may properly impose limits on disciplinary measures involving physical force so long as they are rationally related to a legitimate government interest. *Mallan*, 86 Hawai'i at 451, 950 P.2d at 189. Ex parte TROs under Chapter 586 are rationally related to the legitimate state interest in protecting minors from physical and psychological harm. *See id.* at 451–52, 950 P.2d at 189–90 ("A state interest is 'legitimate' if it involves the public health, safety, or welfare.").

Indeed, Chapter 586 would withstand strict scrutiny as well. Under strict scrutiny analysis, the statute must be narrowly drawn to advance a compelling state interest. *SCI Mgmt. Corp. v. Sims*, 101 Hawai'i 438, 460, 71 P.3d 389, 411 (2003). Here, Chapter 586 advances a compelling state interest in preventing harm to children. *See Doe*, 116 Hawai'i at 335–36, 172 P.3d at 1079–80. The state as *parens patriae* may validly restrict parental rights to ensure children's education, safety, and welfare.[5] *Prince*, 321 U.S. at 166, 64 S.Ct. 438; *Wisconsin v. Yoder*, 406 U.S. 205, 233–34, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (recognizing that parental rights "may be subject to limitation . . . if it appears that parental decisions will jeopardize the health or safety of the child"); *Matavale*, 115 Hawai'i at 158, 166 P.3d at 331 ("The state, however, in the interest of protecting the child's welfare, has a right to limit parental freedom in raising their children."). Paramount among these considerations is the state's "powerful interest in preventing and deterring the battering of children." *Crouser*, 81 Hawai'i at 14, 911 P.2d at 734. The state may thus curtail parental disciplinary rights in order to protect children, who are amongst the most

excessive and harmful to the child's welfare." *Id.* Here, likewise, Father does not have a constitutionally protected right to inflict force upon Minor that falls within the definition of domestic abuse under HRS § 586-1 (1993).

4. HRS § 586-1 defines "domestic abuse" as:
 (1) Physical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault, extreme psychological abuse or malicious property damage between family or household members; or
 (2) Any act which would constitute an offense under section 709-906, or under part V or VI of chapter 707 committed against a minor family or household member by an adult family or household member.
 "Extreme psychological abuse" means an intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual, and that serves no legitimate purpose; provided that such course of conduct would cause a reasonable person to suffer extreme emotional distress.

5. Father references *Troxel*, 530 U.S. 57, 120 S.Ct. 2054, in support of his argument regarding parental rights. *Troxel* concerned the constitutionality of a state statute that allowed any person to obtain visitation rights, over the parents' objections, where the court determined it was in the best interests of the child. 530 U.S. at 61, 67, 120 S.Ct. 2054. In striking down the statute, a plurality of the Supreme Court noted that

> so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

*Id.* at 68–69, 120 S.Ct. 2054; *see also Doe*, 116 Hawai'i at 333–35, 172 P.3d at 1077–79 (striking down similar grandparent visitation statute).
Unlike the statute in *Troxel*, the domestic abuse TRO does not so broadly and directly restrict a fit parent's ability to make decisions concerning child-rearing. At most, it temporarily divests a parent of his or her visitation rights, pending an evidentiary hearing, in order to protect the safety of the child. HRS §§ 586-4 (Supp.2004); 586-5 (Supp. 1998). The right at issue is thus qualitatively different from the broad parental rights implicated in *Troxel* and *Doe*.

vulnerable members of society. *See Prince,* 321 U.S. at 166, 64 S.Ct. 438.

Additionally, HRS Chapter 586 is narrowly drawn to avoid unduly burdening the exercise of parental rights. The definition of "domestic abuse" is narrowly tailored to encompass only acts or threats of "[p]hysical harm, bodily injury, assault," or a course of conduct that "would cause a reasonable person to suffer extreme emotional distress." HRS § 586–1. An ex parte TRO may only be obtained upon a showing of probable cause that acts of abuse may be imminent. HRS § 586–4(c). As discussed below, Chapter 586 contains sufficient procedural safeguards to protect the defendant's liberty interests. *See infra* part IV(A)(2). It is therefore narrowly tailored to protect a compelling state interest.

■ As a related argument, Father asserts that the Family Court erred in failing to apply the "parental discipline" justification provided in the penal code at HRS § 703–309(1).[6] He argues, in essence, that the

Family Court was constitutionally required to consider such a defense to the TRO.

■ HRS § 703–309(1) provides a justification to criminal liability for acts constituting parental discipline.[7] Its language does not expressly or implicitly extend the justification to civil proceedings for a domestic abuse TRO under HRS Chapter 586. Moreover, the definition of "domestic abuse" under Chapter 586 is broad enough to encompass conduct that could satisfy the parental discipline justification. *See* HRS § 586–1. It includes "[p]hysical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault, extreme psychological abuse or malicious property damage between family or household members" *in addition to* acts which constitute criminal domestic abuse under HRS § 709–906. *Id.* The Legislature thus intended the definition of acts constituting domestic violence for purposes of TROs to be broader than those subjected to criminal liability under the penal code.[8]

6. Father also challenges the Family Court's conclusion that "discipline over issues of morals lies with [Mother], who has sole legal and physical custody." Given our ultimate conclusion that the Family Court did not abuse its discretion in issuing the Ex Parte TRO, *see infra* part IV(C), we need not address this point.

7. This statute provides, in relevant part:
 § 703–309 **Use of force by persons with special responsibility for care, discipline, or safety of others.** The use of force upon or toward the person of another is justifiable under the following circumstances:
 (1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:
 (a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and
 (b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

8. Father references *Rezentes v. Rezentes,* 88 Hawai'i 200, 965 P.2d 133 (App.1998), in support of his argument regarding the parental discipline justification. In that case, the ICA concluded

that the definition of "family violence" under HRS § 571–46(9) (1993), relating to child custody, did not include conduct viewed as permissible parental discipline pursuant to HRS § 703–309(1). *Id.* at 201, 965 P.2d at 134. The lower court had specifically found that Mother's conduct fell within the definition of parental discipline under HRS § 703–309(1). *Id.* at 205, 965 P.2d at 138. The ICA concluded that the term "family violence," for purposes of child custody, did not include conduct that constituted permissible discipline. *Id.* It reasoned that the Legislature would not "sanction in one statute the use of certain physical force by a parent to discipline his or her children, and yet characterize in another statute the use of such force as family violence, potentially depriving a parent of custody or visitation." *Id.* at 205–06, 965 P.2d at 138–39. Unlike a custody determination, which is of a more permanent nature and which is made after a full hearing of the issues, an ex parte TRO is temporary in duration and is intended to provide immediate relief if there is "*probable cause* to believe that a past act or acts of abuse have occurred, or that threats of abuse make it probable that acts of abuse *may be* imminent". *See* HRS § 586–4(a) & (c) (emphasis added). It therefore appears that the Legislature intended a lower threshold of proof of domestic abuse for purposes of an ex parte TRO in order to afford immediate, but temporary, protection to potential victims of domestic violence. Moreover, unlike in *Rezentes,* the Family Court determined that Father's striking of Minor did *not* fall within the parameters of proper parental discipline under HRS § 703–309(1).

In any event, in order to satisfy the parental discipline defense, the force employed must have been "reasonably related to the purpose of safeguarding or promoting the welfare of the minor." HRS § 703–309(1)(a). Here, the Family Court addressed father's permissible discipline argument and concluded that even if the defense were available, Father's use of force was not reasonably related to safeguarding or promoting Minor's welfare.[9]

### 2. Procedural Due Process

 Father also argues that the process for obtaining an ex parte TRO under HRS Chapter 586 falls short of the constitutional requirements of procedural due process. Specifically, he challenges the issuance of ex parte TROs without a prior hearing or interview to test the petitioner's veracity. He challenges the provision of form pleadings, which he contends render the process "ripe for horrible abuse." He argues that the Family Court should be required to make specific factual findings in issuing an ex parte TRO. Finally, he appears to advocate a higher burden of proof in justifying the issuance of an ex parte TRO.

First, we note that Hawai'i courts have upheld various portions of HRS Chapter 586. In *Coyle*, for example, the supreme court held that imposing the preponderance of the evidence standard at the TRO hearing, rather than the clear and convincing evidence standard, did not violate the defendant's equal protection or substantive due process rights. 85 Hawai'i at 206–08, 940 P.2d at 413–15. In another case, the supreme court considered the constitutionality of ex parte TROs issued under Hawai'i Family Court Rules (**HFCR**) Rule 65(b). *In re Guardianship of Carlsmith*, 113 Hawai'i 236, 239–40, 151 P.3d 717, 720–21 (2007). Like Chapter 586, Rule 65(b) provides for ex parte restraining orders where the petitioner alleges specific facts showing that "immediate relief" is warranted. It further allows the adverse party to move for dissolution or modification and request a hearing upon providing two days' notice to the petitioner. *Id.* at 240, 151 P.3d at 721. The respondents in *Guardianship of Carlsmith* maintained that issuing ex parte TROs in this manner violated procedural due process. 113 Hawai'i at 239–40, 151 P.3d at 720–21. The supreme court concluded that in view of the emergency nature of Rule 65 TROs, the process offered sufficient safeguards by requiring specific factual allegations and allowing the respondent to swiftly seek a hearing. *Id.* at 241–42, 151 P.3d at 722–23. In dicta, the court noted generally that "TROs, in view of their emergency remedial nature, may constitutionally be granted *ex parte*." *Id.* (internal quotation marks, brackets, and citation omitted).[10] However, it appears that Hawai'i courts have not yet directly considered a procedural due process challenge to the *ex parte* nature of domestic abuse TROs under HRS § 586–4.[11]

 Procedural due process requires "notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant liberty interest." *Guardianship of Carlsmith*, 113 Hawai'i at 239, 151 P.3d at 720 (citation omitted). Beyond this core requirement, procedural due process is not a

---

9. The Family Court specifically found that Father "physically harm[ed], injured or assaulted [Minor] by striking her on August 25, 2005 and by threatening her with further physical harm." It concluded that "[a]ssuming the defendant struck [Minor] because of her refusal to discuss [behavioral issues] late during a school night, ... such an action is not proper parental discipline." It is thus implicit in the Family Court's findings that Father's actions were not reasonably calculated to promote Minor's welfare.

10. The supreme court cited *Luat v. Cacho*, 92 Hawai'i 330, 346, 991 P.2d 840, 856 (App.1999) (concerning sufficiency of notice of hearing for ex parte harassment TRO under HRS Chapter

604); *Kie v. McMahel*, 91 Hawai'i 438, 441, 984 P.2d 1264, 1267 (App.1999) (holding that preponderance of the evidence standard applies at hearings for domestic abuse TROs); and *Coyle*, 85 Hawai'i 197, 940 P.2d 404, for the proposition that "[i]n various harassment and abuse contexts, the issuance of an ex parte TRO has been held proper and not violative of constitutional rights." *Guardianship of Carlsmith*, 113 Hawai'i at 240, 151 P.3d at 721.

11. It appears that every state offers similar remedies in domestic abuse situations, including provisions for ex parte relief. *Nollet v. Justices of the Trial Court of Mass.*, 83 F.Supp.2d 204, 212 (D.Mass.2000).

technical, fixed concept. *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The precise requirements vary depending on the type of proceeding. *Guardianship of Carlsmith*, 113 Hawai'i at 239, 151 P.3d at 720. Due process is ultimately a flexible concept that "calls for such procedural protections as the particular situation demands." *Id.* at 239–40, 151 P.3d at 720–21 (citation omitted).

■ Due process does not always require *prior* notice and a pre-deprivation hearing. *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In some circumstances, post-deprivation procedures will satisfy due process. *Id.* In *Mathews v. Eldridge*, the United States Supreme Court articulated a standard for determining whether post-deprivation procedures are constitutionally adequate.[12] 424 U.S. at 334–35, 96 S.Ct. 893. It set forth three factors that courts must weigh in determining the precise requirements of due process for a particular deprivation: (1) the private interest at stake; (2) the government's interest, "including the function involved and the fiscal and administrative burdens" entailed in more protective procedures; and (3) the probable value of additional or substitute procedural safeguards. *Id.* at 335, 96 S.Ct. 893.

Where a deprivation is effected through state action on behalf of a private party, as in the case of prejudgment attachments to a party's property, the Supreme Court has applied a modified version of the *Mathews v. Eldridge* test. *See Connecticut v. Doehr*, 501 U.S. 1, 11, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991). Instead of examining only the government's interest, the second factor looks principally to the "interest of the party seeking the ... remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections." *Id.* As with prejudgment attachments, ex parte TROs are effected primarily for the benefit of a private party—the petitioner. As a result, the modified *Mathews–Doehr* test applies.[13]

**12.** The Supreme Court in *Mathews* ultimately upheld the challenged post-deprivation procedures for terminating social security disability benefits. 424 U.S. at 349, 96 S.Ct. 893. It weighed the temporary nature of the deprivation and the particular post-deprivation safeguards, which included notification of intent to terminate benefits, an opportunity to respond in writing and proffer additional evidence, the ability to seek post-deprivation intra-agency review, and the opportunity to appeal the termination. *Id.* at 341–49, 96 S.Ct. 893.

**13.** In considering the constitutionality of similar ex parte TRO statutes, the vast majority of courts have applied either the *Mathews v. Eldridge* or the modified *Mathews–Doehr* test. *See, e.g., Pendleton v. Minichino*, 1992 WL 75920, at *5–11 (Conn.Super.Ct.1992) (applying *Mathews–Doehr*); *McKinney v. McKinney*, 820 N.E.2d 682, 688 (Ind.Ct.App.2005) (applying Mathews); *Knight v. Knight*, 525 N.W.2d 841, 844 (Iowa 1994) (applying *Mathews* to reject challenge regarding sufficiency of notice); *State ex rel. Williams v. Marsh*, 626 S.W.2d 223, 230–31 (Mo. 1982) (applying *Mathews* ); *accord People v. Forman*, 145 Misc.2d 115, 546 N.Y.S.2d 755, 763–66 (N.Y.Crim.Ct.1989); *Marquette v. Marquette*, 686 P.2d 990, 995–96 (Okla.Ct.App.1984); *Boyle v. Boyle*, 12 Pa. D. & C.3d 767, 774–75 (1979) (weighing interests of state, petitioner, and defendant, although not expressly applying *Mathews*); *Moore v. Moore*, 376 S.C. 467, 657 S.E.2d 743, 746–48 (2008) (applying *Mathews* to statute providing for emergency TRO hearing); *State v. Karas*, 108 Wash.App. 692, 32 P.3d 1016, 1020–21 (2001).

A few courts have also applied the test set forth in *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). *See Baker v. Baker*, 494 N.W.2d 282, 287–88 (Minn.1992) superseded by statute on other grounds as stated in *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 212 (Minn.2001). (applying both *Mathews* and *Fuentes* tests); *accord State ex rel. Williams*, 626 S.W.2d at 232. *Fuentes* concerned the constitutionality of several statutes authorizing the summary seizure of chattels under a prejudgment writ of replevin without a prior hearing. 407 U.S. at 69–78, 92 S.Ct. 1983. The Court set forth the following test for considering the constitutionality of seizures without a pre-deprivation hearing: (1) the seizure must be "directly necessary to secure an important governmental or general public interest"; (2) there must be a "special need for very prompt action"; and (3) the state must maintain "strict control over its monopoly of legitimate force." *Id.* at 91, 92 S.Ct. 1983. Because ex parte TROs do not effect a seizure of chattels, the *Mathews–Doehr* test is more applicable. *See Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 611, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (noting that line of cases culminating in *Fuentes* and its companion case "merely stand for the proposition that a hearing must be had before one is finally deprived of his

First, we consider the private interest at stake. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. As noted above, it is well-established that parents enjoy a protected liberty interest in the custody, care, and upbringing of their children. *Stanley,* 405 U.S. at 651, 92 S.Ct. 1208; *In re Doe,* 99 Hawai'i at 532, 57 P.3d at 457. The Hawai'i Constitution also protects freedom of movement, subject to the state's reasonable exercise of its police power. *Coyle,* 85 Hawai'i at 206–07, 940 P.2d at 413–14. Ex parte TROs may implicate both of these interests. *See Blazel v. Bradley,* 698 F.Supp. 756, 762 (W.D.Wis.1988); *State ex rel. Williams,* 626 S.W.2d at 230. Here, it temporarily deprived Father of his relationship with Minor by precluding him from contacting her and temporarily terminating his visitation rights. Although the deprivation was limited in duration, its temporary nature does not obviate the requirements of procedural due process. *Fuentes,* 407 U.S. at 84–85, 92 S.Ct. 1983 ("[I]t is now well settled that a temporary, nonfinal deprivation ... is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment."); *see also Pendleton,* 1992 WL 75920, at *5 (recognizing that visitation rights are entitled to due process protection, even against temporary deprivations); *State v. Fernando A.,* 294 Conn. 1, 981 A.2d 427, 442 n.18 (2009) (noting "significant impact" of analogous criminal protective order on defendant's fundamental rights); *Halverson ex rel. Halverson v. Taflin,* 617 N.W.2d 448, 451 (Minn.Ct.App.2000) ("Even a temporary order for protection may deprive a parent of a liberty interest in his or her child."); *Marquette,* 686 P.2d at 995 (noting that temporary interference with father's visitation rights is constitutionally significant). The length and severity of the deprivation factors into the analysis but is not decisive. *Fuentes,* 407 U.S. at 86, 92 S.Ct. 1983. The Ex Parte TRO in this case therefore implicated Father's significant liberty interests.

Second, we consider the petitioner's interests, as well as the government's ancillary interests. *Doehr,* 501 U.S. at 11, 111 S.Ct. 2105. A petitioner for a domestic abuse TRO has a weighty interest in remaining free from physical and psychological abuse. Domestic violence is often volatile, quick to escalate, and potentially fatal. The victim has a strong interest in obtaining immediate relief, as delay may result in further injury or death. *See* Catherine F. Klein and Leslye E. Orloff, *Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law,* 21 Hofstra L.Rev. 801, 1155 (Summer 1993). For many victims of domestic violence, an ex parte TRO is the only practical vehicle to "rescue them from violent attacks and threats of abuse." H. Stand. Comm. Rep. No. 549, in 1987 House Journal, at 1359.

The State likewise has a strong interest in protecting family and household members from harm. *Coyle,* 85 Hawai'i at 208, 940 P.2d at 415. The State's responsibility to protect its citizens especially extends to vulnerable members of society, such as children and "those who cannot protect themselves." *Id.* at 205–206, 940 P.2d at 412–13 (quoting H. Stand. Comm. Rep. No. 130, in 1965 House Journal, at 550). Domestic violence is a problem of "considerable magnitude" that can result in the death of the victim. *Marquette,* 686 P.2d at 996.

Moreover, domestic abuse has wide-ranging ramifications and is undoubtedly an issue of broad public interest. *Id.* at 993. It often affects the community as a whole, giving rise to other social ills such as cycles of abuse, crimes of violence against person and property, juvenile delinquency, and alcohol and drug abuse. *Karas,* 32 P.3d at 1020. Domestic violence is often self-perpetuating, as children raised in violent homes may be more likely to exhibit violent behaviors as adults. Nadine Taub, *Ex Parte Proceedings in Domestic Violence Situations: Alternative Frameworks for Constitutional Scrutiny,* 9 Hofstra L.Rev. 95, 96 (1980–1981); Dorothy Carl Quinn, *Ex Parte Protection Orders: Is Due Process Locked Out?,* 58 Temp. L.Q. 843, 844 n.4 (1985); Note, Linda R. Keenan, *Domestic Violence and Custody Litigation: The Need for Statutory Reform,* 13 Hofstra L.Rev. 407, 420–21 (1985).

property and do[es] not deal at all with the need for a pretermination hearing where a full and

immediate post-termination hearing is provided").

As our legislature has recognized, "domestic violence is one of the most serious problems affecting our community." S. Stand. Comm. Rep. No. 3252, in 1998 Senate Journal, at 1314. Thus, the public itself has an "extraordinary interest in a society free from violence, especially where vulnerable persons are at risk." *Baker*, 494 N.W.2d at 288; *see also Grant v. Pugh*, 25 Misc.3d 417, 887 N.Y.S.2d 802, 808 (N.Y.Fam.Ct.2009) (recognizing that a state's "extraordinary interest in protecting victims of domestic violence from actual or threatened injury and children from the effects of exposure to domestic violence justifies the use of immediate measures to stop the violence") (internal quotation marks and citation omitted). Ex parte TROs therefore protect significant interests of both the petitioner and the State.

Third, we consider the risk of erroneous deprivation, the "fairness and reliability of the existing [pre-deprivation] procedures," and the probable value of additional safeguards. *Mathews*, 424 U.S. at 335, 343, 96 S.Ct. 893. The ex parte TRO process under HRS Chapter 586 includes a number of procedural safeguards. The petitioner must allege past acts of abuse or threats of abuse, including the "specific facts and circumstances from which relief is sought." HRS § 586-3(c) (Supp.2004). The allegations must be made under oath and penalty of perjury. *Id.* An ex parte TRO may only be granted if necessary to prevent acts of abuse, and only upon a finding of probable cause that past acts have occurred or that further abuse is imminent. HRS § 586-4(c). The court must hold a hearing on the earliest possible date, but no later than within fifteen days from the date of issuance. HRS § 586-5(b). At the hearing, the petitioner has the burden of proving the allegations by a preponderance of the evidence. *Coyle*, 85 Hawai'i at 206, 940 P.2d at 413. Because the Family Court has discretion to determine the duration of the TRO (subject to a ninety-day limit), the defendant may move to vacate or modify the TRO at any point. *Kie*, 91 Hawai'i at 442, 984 P.2d at 1268. Chapter 586 thus provides a number of procedural safeguards, including a plenary post-deprivation hearing, to protect the defendant's interests.

Father argues that the court should hold a hearing, or at least an interview, prior to issuance in order to test the petitioner's veracity. Such a requirement, however, would vitiate the ex parte nature of the TRO. The purpose of an ex parte TRO is to prevent further acts of abuse by "assur[ing] a period of separation" between the parties. *State v. Grindling*, 96 Hawai'i 402, 404, 31 P.3d 915, 917 (2001); *accord Kie*, 91 Hawai'i at 442, 984 P.2d at 1268; *Coyle*, 85 Hawai'i at 205, 940 P.2d at 412. Immediate relief is often necessary to enable a victim of domestic violence to swiftly escape a volatile situation. Requiring prior notice or an immediate hearing would subject the petitioner to an increased risk of abuse. *Baker*, 494 N.W.2d at 288 (noting that requiring prior notice would "result in unnecessary and possibly dangerous time delays."); *Boyle*, 12 Pa. D. & C.3d at 774. Moreover, ex parte TROs serve an important function in providing emergency relief without the formality, time-intensiveness, and procedural obstacles of other civil and criminal remedies. They provide a swift and accessible remedy to meet the urgency of a domestic abuse situation. *See In re Marriage of Fiffe*, 140 P.3d 160, 162 (Colo.Ct.App.2005) ("A temporary protection order is usually requested under immediate, urgent circumstances and, thus, most often is ruled upon ex parte."); *Paschal v. Hazlinsky*, 803 So.2d 413, 417 (La.Ct.App. 2001) (noting urgency of domestic violence situations). Thus, requiring a prior hearing would defeat the purpose of offering immediate relief from imminent danger. *Boyle*, 12 Pa. D. & C.3d at 774.

Father also suggests that the availability of form pleadings renders the process too vulnerable to abuse. We disagree. Form pleadings allow victims of domestic violence greater accessibility to the courts and render the process more amenable to obtaining emergency relief. In requiring the availability of form pleadings, the Legislature sought to simplify the procedure by "enabl[ing] applicants for a temporary retraining order to apply for the order themselves." Conf. Com. Rep. No. 17, in 1979 Senate Journal, at 945; *see also* Conf. Com. Rep. No. 15, in 1979 House Journal, at 1077. In

1982, it re-enacted the statutory scheme for ex parte TROs, including the availability of form pleadings, in order to "streamline the procedures for obtaining and issuing ex parte temporary restraining orders" and as part of a broader effort to provide "greater flexibility in trying to calm the emotionally charged nature of [domestic abuse] situations." Conf. Comm. Rep. No. 1, in 1982 House Journal, at 815; S. Stand. Comm. Rep. No. 643, in 1982 Senate Journal, at 1222. The forms still require the petitioner to supply the specific factual allegations in their own words. Finally, the forms contain a declaration that the petition is made under penalty of perjury. Given the exigent nature of ex parte TROs, and the State's legitimate interest in providing an accessible procedure for obtaining them, the form pleadings offer sufficient protection of both parties' interests.

 Next, Father argues that the Family Court should be required to enter specific findings as to the underlying allegations before issuing an ex parte TRO. He maintains that "[a] generic finding of abuse or threats is insufficient to determine probable cause." (Emphasis omitted.) In issuing an ex parte TRO, the order itself must state that the Family Court has found "probable cause to believe that a past act or acts of abuse have occurred, or that threats of abuse make it probable that acts of abuse may be imminent," and that the order is necessary to prevent further abuse by ensuring a period of separation. HRS § 586-4(c). Because of the nature of the ex parte process, the sole basis for the Family Court's finding is the petition itself. Requiring the Family Court to issue additional findings detailing the allegations contained in the petition would therefore be of little value and would cause unnecessary delay.

 Finally, Father appears to contend that due process requires a higher burden of proof for issuing ex parte TROs. He references the "totality of circumstances" standard for probable cause in the criminal context, as set forth in *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). HRS § 586-4 does not define "probable cause." In criminal cases, Hawai'i courts have defined "probable cause" as "more than a mere suspicion but less than a certainty." *State v. Maganis*, 109 Hawai'i 84, 86, 123 P.3d 679, 681 (2005) (internal quotation marks and citation omitted). It is a flexible, non-technical concept that requires a case-by-case evaluation of all the facts and circumstances before the court.[14] *Id.* at 86–88, 123 P.3d at 682–83; *see also State v. Chong*, 52 Haw. 226, 231, 473 P.2d 567, 571 (1970); *State v. Detroy*, 102 Hawai'i 13, 18, 72 P.3d 485, 490 (2003); HRS § 803–5(b) (1993) (codifying "facts and circumstances" test for probable cause for arrest). This standard reflects the Family Court's limited ability to weigh conflicting evidence in the context of an ex parte petition. The court need not apply the preponderance of the evidence standard where only one party's evidence is available. Given the nature of the ex parte process, the weight of the state's interest in preventing domestic violence, and the petitioner's interest in avoiding imminent abuse, the probable cause standard provides an adequate procedural safeguard.

Numerous courts have upheld ex parte TROs or orders for protection under similar provisions so long as at least four minimum procedural safeguards are present: "[1] participation by a judicial officer; [2] a prompt post-deprivation hearing; [3] verified petitions or affidavits containing detailed allegations based on personal knowledge; and [4] risk of immediate and irreparable harm." *Blazel*, 698 F.Supp. at 764.[15] HRS Chapter 586 provides all four safeguards: only a family court judge may issue an ex parte TRO; a

---

14. The criminal standard involves due consideration for the defendant's weighty liberty interest in remaining free from unfounded arrests and charges of crime. *Maganis*, 109 Hawai'i at 87–88, 123 P.3d at 682–83.

15. *See also Eisenbart v. Wisconsin*, 993 F.2d 1549, 1993 WL 134608, at *3 (7th Cir.1993)

(table); *Nollet*, 83 F.Supp.2d at 212–14; *Willmon v. Daniel*, 2006 WL 1683425, at *6–7 (N.D.Tex. 2006) (setting forth *Blazel* requirements without reaching conclusion as to their application); *Willmon v. Daniel*, 2007 WL 518555, at *4 (N.D.Tex.2007) (referencing *Blazel* in upholding issuance of ex parte TRO).

hearing must be held within fifteen days;[16] the verified petition must allege specific facts based on personal knowledge; and the ex parte TRO must be necessary to prevent acts of abuse. *See* HRS §§ 586–3(c); 586–4(c); 586–5(b). Although it does not expressly require a risk of immediate harm, such a requirement is inherent in the condition that ex parte TROs be granted only if necessary to prevent acts of abuse. HRS § 586–4(c). The overall standard requires the petitioner to allege immediate danger because past acts or threats render it "probable that acts of abuse may be imminent." *Id.* This standard reflects the core function of ex parte TROs as an emergency remedy.[17]

There is undoubtably some residual risk of error in the ex parte process. *See, e.g., Forman,* 546 N.Y.S.2d at 765 (recognizing risk of error in absence of prior evidentiary hearing). In making its initial decision, the court has only the petitioner's affidavit to rely upon and does not have the advantage of considering live witnesses who are subject to cross-examination. It is especially difficult for a family court judge to discern possible improper motives, such as retaliation or strategy related to an underlying divorce or custody case, through an ex parte petition. *Pendleton,* 1992 WL 75920, at *6.

Nevertheless, the strength of the state's and petitioner's interests, the "emergency nature of the decision," and the "practical difficulties inherent in convening an immediate evidentiary hearing", mitigate against requiring further procedural protections.[18] *Forman,* 546 N.Y.S.2d at 765 (upholding ex parte TROs despite "the evident if unquantifiable risk of error"); *see also Pendleton,* 1992 WL 75920, at *8 (concluding that imposing evidentiary requirements would create procedural obstacles and time-consuming delay, "frustrating the effective and immediate protection that the legislature sought to make available"); *Halverson ex rel. Halverson,* 617 N.W.2d at 451 (noting in dicta that in "ex parte emergency circumstances," parent's due process interests yield to considerations of child's welfare). Due process does not require procedural safeguards to be so comprehensive as to "preclude any possibility of error." *Mackey v. Montrym,* 443 U.S. 1, 13, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979).

We therefore reject Father's various arguments to the effect that HRS Chapter 586 provides insufficient safeguards to comport with procedural due process requirements.[19]

16. Various courts have readily upheld ex parte TRO statutes providing for a post-deprivation hearing within seven to fifteen days. *See* Quinn, *Ex Parte Protection Orders,* 58 Temp. L.Q. at 850 (noting range of five to twenty days); *Pendleton,* 1992 WL 75920, at *9 (fourteen days); *Kampf v. Kampf,* 237 Mich.App. 377, 603 N.W.2d 295, 299 (1999) (five to fourteen days); *Baker,* 494 N.W.2d at 290 (seven days); *State ex rel. Williams,* 626 S.W.2d at 231 (fifteen days); *Boyle,* 12 Pa. D. & C.3d at 771 (ten days); *Karas,* 32 P.3d at 1019 (fourteen or twenty-four days, depending on type of service); *Schramek v. Bohren,* 145 Wis.2d 695, 429 N.W.2d 501, 504 (App.1988) (seven days). Other courts have upheld statutes providing for a hearing within twenty days. *See, e.g., MacDonald v. State,* 997 P.2d 1187, 1189 (Alaska App.2000). HRS § 586–5(b) thus falls within a widely accepted range.

17. The legislative history of section 586–4 confirms that the purpose of ex parte TROs is to provide emergency relief from imminent harm. In 1998, the Legislature removed the requirement that the petitioner allege recent acts or threats of abuse in order to obtain an ex parte TRO. *See* 1998 Haw. Sess. Laws Act 172, § 2 at 642–43. However, it cautioned that "[i]ssuing restraining orders for acts of abuse that occurred in the distant past would be inconsistent with the purpose of temporary restraining orders." H. Stand. Com. Rep. No. 578–98, in 1998 House Journal, at 1264. The Legislature has consistently affirmed the purpose of ex parte TROs to prevent imminent violence by "assuring a period of separation of the parties involved." 1979 Haw. Sess. Laws, Act 168, § 1 at 345–46; *see also* S. Stand. Com. Rep. No. 3252, in 1998 Senate Journal, at 1314–15; H. Stand. Com. Rep. No. 578–98, in 1998 House Journal, at 1264–65; HRS § 586–4(c).

18. Some commentators have reflected that the nature of domestic abuse lessens the risk of error in issuing ex parte TROs. *See* Taub, *Ex Parte Proceedings in Domestic Violence Situations,* 9 Hofstra L.Rev. at 116–20. Victims of domestic abuse are often reluctant to seek the assistance of courts because of negative social stigma, fear of retaliation, and complex psychological reasons. *Id.*

19. In so holding, we join with a number of other courts that have upheld similar provisions for ex parte TROs in domestic abuse situations against procedural due process challenges. *See, e.g.,*

B. *The Process for Obtaining an Ex Parte TRO Is Not Unconstitutionally Gender–Biased*

 As his second point of error, Father essentially asserts that the process for obtaining an ex parte TRO is unconstitutionally gender-biased. However, he raises only conclusory allegations that the ex parte process is "discriminatory against men," resulting in "gender profiling." He requests that the "bias and brainwashing regarding male-only perpetrators or batter[ers] end completely." Given his failure to assert a cogent argument, we need not address this point of error. *See* HRAP Rule 28(b)(7) ("Points not argued may be deemed waived.").

 Even if we were to construe Father's argument as an equal protection claim, it is without merit. In order to assert a gender-based equal protection claim, Father must establish that HRS Chapter 586 imposes a classification on the basis of gender. *State v. Tookes,* 67 Haw. 608, 614, 699 P.2d 983, 987–88 (1985). Here, the statute on its face is gender-neutral: it is available to all victims of domestic violence, male or female. Even if Father based his claim on an allegedly discriminatory pattern in the issuance of TROs in favor of women, he would have to show such an overwhelming pattern of invidious discrimination that an intent to discriminate could be inferred. *Id.* at 614, 699 P.2d at 988. Father has not asserted any evidentiary basis for inferring such a pattern of discrimination. *See id.* (holding that prostitution statute did not violate equal protection where it was gender-neutral and defendant failed to sustain evidentiary burden of showing pattern of discriminatory enforcement). His conclusory allegations on this point are unsupported by the record.

*Pendleton,* 1992 WL 75920, at *11 (concluding that ex parte TROs are "directly necessary to effect the valid government interest in protecting the victims of physical abuse"); *Fernando A.,* 981 A.2d at 443–45 (upholding similar provision regarding criminal order for protection); *Sanders v. Shephard,* 185 Ill.App.3d 719, 133 Ill.Dec. 712, 541 N.E.2d 1150, 1155–56 (1989) (concluding that exigent circumstances justify ex parte process); *Kampf,* 603 N.W.2d at 299–300; *Baker,* 494 N.W.2d at 288; *State ex rel. Williams,* 626 S.W.2d at 231–32; *Forman,* 546 N.Y.S.2d at 763–66; *Marquette,* 686 P.2d at 995–96; *Boyle,*

C. *The Family Court Did Not Abuse its Discretion in Issuing the Ex Parte TRO*

 Lastly, Father argues that the Family Court abused its discretion in issuing the Ex Parte TRO. Specifically, he contends that the court clearly erred in finding that (1) Father inflicted physical harm upon Minor; (2) Father threatened Minor with further physical harm; (3) Father's actions did not constitute parental discipline; and (4) Father's actions placed Minor in immediate danger. He asserts an overarching argument that Mother filed the "bogus" Petition solely as a means to gain the upper hand in an upcoming child custody hearing.[20]

As these arguments largely concern factual findings, we may only overturn them if the Family Court clearly erred. *In re Doe,* 95 Hawai'i at 190, 20 P.3d at 623. A finding of fact is clearly erroneous if it is unsupported by substantial evidence in the record or the appellate court is "left with a definite and firm conviction that a mistake has been made." *Id.* (internal quotation marks and citation omitted).

Here, Minor testified that on August 12, 2005, Father struck her several times. She described in detail the manner in which he hit her, explaining that he tried to hit her face but she blocked his hand before he could reach it. She testified to a second incident on August 25, when Father hit her on her arms as she was covering her head. She stated that Father then told her, "Don't make me do that again. . . . Don't make me hit you again." She testified that the argument occurred because she did not want to talk with him at 11:00 p.m. on a school night.

12 Pa. D. & C.3d at 774–75; *Karas,* 32 P.3d at 1020–21; *Schramek,* 429 N.W.2d at 505–06 (summarily upholding ex parte process where petitioner's safety was in jeopardy).

20. Father requests that we take judicial notice of the custody case, UCCJ No. 98–0028. Although appellate courts may, in their discretion, take judicial notice of matters not presented to the trial court, Father has not supplied the relevant records. *See Eli v. State,* 63 Haw. 474, 478, 630 P.2d 113, 116 (1981). We thus limit our review to the record in the instant case.

Although Father offered a different account of what happened, the Family Court acted within its exclusive province as fact-finder in reconciling conflicting testimony. *State v. Jenkins*, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000). It is not the role of this court to weigh the credibility of witnesses. *Id.* Here, Minor's testimony provides substantial evidence in support of the Family Court's findings. The Family Court did not clearly err in finding that Father inflicted physical harm on Minor and threatened her with further physical harm, and that his actions were not calculated to promote Minor's welfare.

■ Father also argues that the Family Court erred in concluding that Minor was in "immediate danger," justifying the issuance and continuation of the TRO. The Petition alleged that Minor was in immediate danger of further abuse because of Father's "previous actions such as hitting me on Aug. 12th and Aug. 25th, showing up at my school, and verbally abusing me." Father points out that the Petition was not filed until September 23, 2005, nearly a month after the last physical incident occurred. He maintains that because of the time lag, Minor could not have been in immediate danger. We disagree.

In order to obtain an ex parte TRO, the petitioner need not allege recent acts of abuse, but only "*past act or acts* of abuse" or "threats of abuse" that make it probable that further acts of abuse may be imminent. HRS §§ 586-3; 586-4(c) (emphasis added). In 1998, the Legislature abolished the requirement that the petitioner allege *recent* acts of abuse in order to obtain an ex parte TRO. *See* 1998 Haw. Sess. Laws Act 172, § 2 at 642–43. It sought to provide judges with more discretion in granting TROs, but cautioned that they should not issue TROs for "incidents that are too remote in time," as "[i]ssuing restraining orders for acts of abuse that occurred in the distant past would be inconsistent with the purpose of temporary restraining orders." H. Stand. Comm. Rep. No. 578–98, in 1998 House Journal, at 1264.

The petitioner must allege past acts or threats demonstrating a probability that further acts of abuse "may be imminent." HRS § 586-4(c). In determining whether imminent abuse is probable, the Family Court should take into account the severity, frequency, and freshness of the alleged acts. However, the statute does not impose a rigid time frame for relief stemming from past acts.

Here, the Petition and testimony at the hearing alleged two separate acts of physical abuse, both occurring under similar circumstances when Minor was in Father's care and custody. They asserted that Father threatened further acts of physical harm. Finally, both the Petition and testimony concerned a third, more recent act of psychological abuse that occurred on September 16, 2005, only a few days before the Petition was filed.[21] Taken as a whole, the allegations support the Family Court's finding of immediate danger.

In a similar case, the respondent to an ex parte TRO raised a similar argument that "the applicant's claim of present and immediate danger is undercut by the fact that she waited seven hours to call the police on the night of the alleged threat and seven days until seeking the ex parte order since this delay belies any claim of imminent danger." *Pendleton*, 1992 WL 75920, at *7. The primary allegation in the petition was the respondent's implied threat to kill the petitioner. *Id.* at *2. The court examined the nature of the threat in considering the likelihood of violence. *Id.* at *7. It reasoned that although the threat had not yet materialized, the danger remained "unabated until the time the ex parte order was sought and beyond." *Id.*

Here, Father's alleged threat ("Don't make me hit you again") was confined to a heated argument and was not as serious as the respondent's death threat in *Pendleton*. Nonetheless, the threat, in conjunction with the two prior acts of physical harm as well as the allegation of recent psychological abuse, gave rise to a reasonable conclusion that the

---

**21.** Although the Family Court did not enter any specific findings as to the September 16th incident, it concluded that "[t]he material allegations of the petition have been proven."

risk of further harm persisted and that a period of separation was necessary to prevent imminent harm. Thus, the Family Court did not err in issuing the Ex Parte TRO and allowing it to remain in force until its expiration.

### V. CONCLUSION

For the foregoing reasons, we affirm.