270 P.3d 1024

**Lily E. HAMILTON on behalf of Amber J. LETHEM, a minor, Respondent/Plaintiff–Appellee,**

v.

**Christy L. LETHEM, Petitioner/Defendant–Appellant.**

**No. SCWC–27580.**

Supreme Court of Hawai'i.

Feb. 7, 2012.

Robert H. Thomas and Rebecca A. Copeland (Damon Key Leong Kupchak Hastert), for petitioner/defendant-appellant.

Stephen T. Hioki, for respondent/plaintiff-appellee.

NAKAYAMA, Acting C.J., ACOBA, DUFFY, and McKENNA JJ., and Circuit Judge CRANDALL, in place of RECKTENWALD, C.J., Recused.

Opinion of the Court by ACOBA, J.

We hold that (1) parents have a constitutional right to discipline children inhering in their liberty interest in the care, custody, and control of their children, under the due process clause, article 1, section 5 of the Hawaiʻi Constitution, (2) a parent may raise the right of parental discipline in a Hawaiʻi Revised Statutes (HRS) § 586–5 show cause hearing in opposition to the continuation of a temporary restraining order (TRO) issued under HRS chapter 586 on allegations of domestic abuse, (3) in such circumstances trial courts shall consider whether the discipline is reasonably related to the purpose of safeguarding or promoting the welfare of the minor in determining whether the parent's conduct constituted abuse or proper discipline, and (4) generally a non-custodial parent retains the right to discipline a child when the child is under his or her supervision. Under the foregoing propositions, we vacate the September 21, 2011 judgment of the Intermediate Court of Appeals (ICA) filed pursuant to its June 30, 2011 published opinion, and the October 5, 2005 Order Regarding Temporary Restraining Order of the Family Court of the First Circuit(the court) issued under HRS chapter 586,[1] against Petitioner/Defendant-

---

1. The relevant sections of HRS § 586 (2006 Repl.) follow;

§ 586–1 **Definitions.** As used in this chapter:
"Domestic abuse" means:
(1) Physical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault, extreme psychological abuse or malicious property damage between family or household members; or
(2) Any act which would constitute an offense under section 709–906, or under part V or VI of chapter 707 committed against a minor family or household member by an adult family or household member.
"Extreme psychological abuse" means an intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual, and that serves no legitimate purpose; provided that such course of conduct would cause a reasonable person to suffer extreme emotional distress.
"Family or household member" means spouses or reciprocal beneficiaries, former spouses or former reciprocal beneficiaries, per-

Appellant Christy L. Lethem (Petitioner) and in favor of his then-fifteen-year-old minor daughter, Amber J. Lethem (Minor) in an HRS chapter 586 petition alleging domestic abuse of Minor brought by Petitioner's ex-wife, Respondent/Plaintiff–Appellee Lily E. Hamilton (Mother or Respondent).

## I.

The following essential matters, some verbatim, are from the record and the submissions of the parties.

### A.

On September 23, 2005, Mother filed an Ex Parte Petition for a Temporary Restraining Order (TRO) and Statement on behalf of Minor to enjoin Petitioner from contacting, calling, or visiting Minor pursuant to HRS chapter 586. Petitioner had allegedly "physically harmed, injured or assaulted" Minor by

"slapping, punching, [and] hitting" her on August 25, 2005. Petitioner had also allegedly subjected Minor to extreme psychological abuse by "showing up at [her] school unannounced, putting [her] down by blaming financial problems on [her], and saying [that] many problems (such as work problems/emotional distress) [were her] fault." The last date alleged for these incidents was September 16, 2005. The petition stated that Minor believed she was in immediate danger of being abused by Petitioner because "of previous actions [by Petitioner,] such as hitting [her] on [August 12 and August 25], showing up at [her] school, and verbally abusing [her] as previously stated."

The court granted the ex-parte TRO the same day it was filed, prohibiting Petitioner from threatening Minor or anyone living with Minor, or contacting, writing, telephoning or otherwise electronically contacting Minor,

sons who have a child in common, parents, *children*, persons related by consanguinity, persons jointly residing or formerly residing in the same dwelling unit, and persons who have or have had a dating relationship.

....

"Malicious property damage" means an intentional or knowing damage to the property of another, without his consent, with an intent to thereby cause emotional distress.

(Emphases added.)

HRS § 586–4 (2006 Repl.) entitled "Temporary Restraining Order," states in relevant part as follows: (a) *Upon petition to a family court judge, an ex parte temporary restraining order may be granted without notice* to restrain either or both parties from contacting, threatening, or physically abusing each other, notwithstanding that a complaint for annulment, divorce, or separation has not been filed. The order may be granted to any person who, at the time the order is granted, is a family or household member as defined in section 586–1 *or who filed a petition on behalf of a family or household member.* The order shall enjoin the respondent or person to be restrained from performing any combination of the following acts:

(1) *Contacting, threatening, or physically abusing the protected party;*

(2) Contacting, threatening, or physically abusing any person residing at the protected party's residence; or

(3) Entering or visiting the protected party's residence.

(Emphases added.)

HRS § 586–5 (2006 Repl.) provides in relevant part:

§ **586–5 Period of order; hearing.** (a) A temporary restraining order granted pursuant to this chapter shall remain in effect at the

discretion of the court, *for a period not to exceed ninety days from the date the order is granted.*

(b) On the earliest date that the business of the court will permit, but *no later than fifteen days from the date the temporary restraining order is granted, the court, after giving due notice to all parties, shall hold a hearing on the application requiring cause to be shown why the order should not continue.* In the event that service has not been effected, the court may set a new date for the hearing; provided that the date shall not exceed ninety days from the date the temporary restraining order was granted. All parties shall be present at the hearing and may be represented by counsel.

(Emphases added.)

HRS § 586–5.5 (2006 Repl.) provides in relevant part:

§ **586–5.5 Protective order; additional orders.**

(a) If, *after hearing all relevant evidence, the court finds that the respondent has failed to show cause why the order should not be continued* and that a protective order is necessary to prevent domestic abuse or a recurrence of abuse, *the court may order that a protective order be issued for a further fixed reasonable period as the court deems appropriate.*

(Emphases added.)

HRS § 586–11 (2006 Repl.) provides in relevant part:

§ **586–11 Violation of an order for protection.**

(a) Whenever an order for protection is granted pursuant to this chapter, a respondent or person to be restrained who knowingly or intentionally violates the order for protection is guilty of a misdemeanor.

and from visiting or remaining within 100 yards of Minor for ninety days until December 22, 2005. A show cause hearing was scheduled for October 5, 2005 pursuant to HRS § 586–5(b) as to whether the TRO should continue.

At the hearing, in which Petitioner was represented by counsel, Minor alleged three incidents of abuse. The first allegedly occurred on August 12, 2005. The day before, August 11, 2005, Minor was scheduled to have visitation with Petitioner after school. Minor called Petitioner and told him that she did not need a ride from school because Mother was going to pick her up. This turned out to be a fabrication. Instead, Minor, another teenage girl, and two teenage boys drove to a store to pick up the "morning after pill" for the other girl. That evening, Petitioner called Mother in an attempt to locate Minor, but Mother had not heard from Minor. Petitioner eventually decided to drive to Mother's house. When Petitioner reached Mother's house at around 10:00 p.m., Minor had arrived and Petitioner took Minor back to his home.

The next day, August 12, 2005, Petitioner and Minor spoke. When Petitioner learned what Minor had done, he became very angry. Petitioner informed Minor that he felt she should have told the other girl's parents that their daughter was sexually active and should have allowed them to deal with the situation. Minor testified that she felt she did not have to talk with Petitioner because she had already spoken to Mother about the situation. Minor related that both she and Petitioner were yelling. Petitioner claimed that Minor was "just ranting and raving," and "screaming" at her younger sister. Minor testified that, at some point, Petitioner hit her. Minor claimed that Petitioner struck her "a couple of times" and that Petitioner was attempting to slap her on the face but that she blocked his blows. Petitioner claimed that he only tried to hit Minor on the shoulder because Minor had tried to leave and Petitioner wanted her to stay and talk to him.

Mother was told that Minor and Petitioner were having an argument and called the police. When the police arrived, Minor told them that she was fine and the police left.

Minor had no bruises as a result of the incident.

The second incident of alleged abuse took place on August 25, 2005. Minor claimed that she and Petitioner "got into a power struggle." Minor had gone to Petitioner's house that day early in the evening. Petitioner wanted to speak to Minor, but she did not want to talk because she "had to call other friends to get [her] homework and [was] busy." According to Minor, Petitioner wanted to discuss "how [her] day went." [2] Minor acknowledged that Petitioner waited several hours to speak with her. At around 11:00 p.m., Petitioner again attempted to speak with Minor. Minor did not want to converse and said, "Dad, I have school tomorrow. I'd really like to go to bed." Petitioner allegedly said, "No, we talk now." The two then began to argue. Minor claimed that Petitioner then hit her. She stated, "[A]s I was covering my head, like, he hit me on my arms." Petitioner also allegedly told Minor, "Don't make me do that again." Minor then called her Mother and told her that she was uncomfortable staying with Petitioner.

The last incident of abuse allegedly took place on September 16, 2005. According to Minor, Petitioner visited her school unannounced. The principal went to Minor's classroom and said that he needed to speak to her. Once outside the classroom, the principal told Minor, "Your father is downstairs. We need to handle this now." Minor claimed that Petitioner had been threatening to take her out of private school to discipline her. According to Minor, Petitioner began to say "how everything had been [her] fault," "how [Petitioner's] financial problems were [her] fault," and how Minor's younger sister was "better than" Minor in various ways. Minor testified that she felt Petitioner was "bringing [her] down."

Petitioner claimed that he was simply attempting to discipline Minor. Petitioner stated that Minor was difficult at times, would lie to him, and refused to follow reasonable rules, such as not riding in a car with anyone under the age of twenty-one. He claimed, however, that he never attempted to

---

**2.** This incident, thus, was apparently not related to the August 12 "birth control" incident.

hit [Minor's] face, that he only visited her at school twice to talk to her, and that he never blamed his financial problems on her.

At the conclusion of the hearing, the court found that the TRO was warranted. The court's reasoning rested on the ground that Petitioner did not have a right to discipline Minor because Mother had sole legal custody. The court stated that if Minor had been visiting Petitioner and he had "caught [her] doing drugs," then Petitioner "ha[d] the right to use physical force, if necessary." However, the court believed that Petitioner's case was different because "we're talking about an ongoing philosophy of how [parents] should run [children's] lives ... [and that,] unfortunately[,] falls with [Mother,] not [Petitioner]."

In the same vein, the court concluded that HRS § 703–309,[3] which sets forth the circumstances in which use of force by a parent is justifiable in the context of criminal prosecutions, was relevant,[4] but that Petitioner could not take advantage of it because Mother had sole legal custody of Minor. The court indicated that it might read HRS § 703–309(1) to afford a baby-sitter "certain rights" to discipline a child when it "becomes necessary regarding activities that happen during their [sic] period of care and custody," but that it was concerned "whether or not what this child did was in fact something that happened during the period of [Petitioner's] care and custody."

There was no mention of the term abuse in the court's oral and written findings. Instead, the court stated that "[t]here's no question in my mind that [Petitioner and Minor] still love each other, and they do have and should have an ongoing relationship." The court stated, however, that it was "struck ... by Section 4(a)(3)[5] ... [and] really [had] no choice but to make a finding that what happened in this [case] was not parental discipline." From the context, it appears that the court was under the impression that because Mother had sole legal custody, Petitioner was not permitted to discipline Minor on the occasions alleged by Minor.

On November 3, 2005, Petitioner filed his notice of appeal. On March 3, 2006, at Petitioner's request, the court entered its findings of fact (findings) and conclusions of law (conclusions). In its findings, the court only discussed the August 25 incident in which Petitioner had struck Minor at around 11:00 p.m. after she refused to speak to him about the apparent birth control incident.[6] The court did not mention the other two incidents. Additionally, in its written decision, the court concluded that HRS § 703–309(a) had no application to Petitioner's case because that section only applied to criminal

---

**3.** HRS § 703–309 (1993) provides in relevant part:

> **§ 703–309 Use of force by persons with special responsibility for care, discipline, or safety of others.** The use of force upon or toward the person of another is justifiable under the following circumstances:
>
> (1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:
>
> (a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and
>
> (b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

**4.** The court [orally ruled as follows]:

> I do note the citation of 703–309, though (inaudible) also instructed them to (inaudible) the 703–309 definition is used in criminal cases. Nevertheless, 703–309 is very instructive in civil matters.
>
> There may be a question of application, but I think there is some sort of relevance for 793— 703–309. As Petitioner's counsel has stated on record, 703–309A [sic] says if the actor is the parent, guardian, or other person similarly responsible for the care and supervision of a minor.

**5.** The court was apparently referring to Section IV.A.3 of the TRO application, in which Minor placed a checkmark next to the box stating "[Petitioner] has physically harmed, injured or assaulted me by: ... slapping, punching, hitting me."

**6.** The court apparently confused the dates. The testimony at the hearing was that the "morning-after pill" incident took place on August 12. The incident that took place on August 25 was, according to Minor's testimony at the hearing, unrelated to the August 12 incident.

cases. The court also concluded that the responsibility to discipline was Mother's only, as the sole legal custodian, but that in any event, "[a]ssuming ... [Petitioner] struck [Minor] because of her refusal to discuss [the birth control] issue late during a school night, the court concludes that such an action is not proper parental discipline."

### B.

On appeal before the ICA, Petitioner represented himself. He argued that (1) chapter 586 violated his right to discipline his children;[7] (2) chapter 586 ran afoul of procedural due process protections;[8] (3) chapter 586 was gender-biased,[9] and (4) the court abused its discretion in concluding that a TRO was warranted under the circumstances.[10]

The ICA held, in an unpublished May 16, 2008 disposition, that Petitioner's case was moot because the TRO had expired by its own terms on December 22, 2005. *Hamilton v. Lethem*, No. 27580, 2008 WL 2069780 (App. May 16, 2008(SDO)) [hereinafter *Hamilton I*]. Judge Foley dissented, explaining that because the appeal was moot, he would dismiss it rather than vacate it, as the majority had done. *Id.* This court vacated, adopting the collateral consequences exception to the mootness doctrine, and concluding that Petitioner's case fell under that exception because there was a reasonable likelihood that the issuance of the TRO would harm Petitioner's reputation, and remanded to the ICA to address the merits. *Hamilton v. Lethem*, 119 Hawai'i 1, 12, 193 P.3d 839, 850 (2008) [hereinafter *Hamilton II*]. As noted by Petitioner, this court stated,

> [T]he TRO was issued by the family court based upon its express ruling that [Petitioner] did physically harm, injure[ ] or

assault [Minor]. Such ruling implies that [Petitioner] is a child abuser and is, therefore, potentially dangerous, thereby undermining his reputation and standing in the community. Additionally ... the issuance of the TRO against [Petitioner] did not require him to register in a public database; however, the TRO, once issued, became part of the public record. As such, there is a reasonable possibility that [p]otential employers and landlords [might be] reluctant to employ or rent to [Petitioner] once they learn of his status as a ['child abuser']. Indeed, pursuant to HRS chapter 586, any TRO issued under such chapter must be copied to the appropriate law enforcement agency, HRS § 586–10 (2006), and reported to the department of human services for investigation, HRS § 586–10.5 (2006). Thus, the issuance of the TRO could also adversely affect [Petitioner]'s personal and professional life, employability, associations with neighbors, [and] choice of housing.

*Id.* (internal quotation marks and citations omitted). This court "vacate[d] the ICA's June 23, 2008 judgment on appeal and remand[ed] the case to the ICA with instructions to address the merits of [Petitioner's] case." *Id.*

### C.

On remand, without further briefing or argument, the ICA held that HRS chapter 586, which empowers the family court to grant a TRO in cases of domestic abuse, did not violate the procedural or substantive due process guarantees of the Fourteenth Amendment to the United States Constitution or of article 1, section 5 of the Hawai'i Constitution because parents do not have a right to abuse their children. *Hamilton III*,

---

7. Mother, who was the Plaintiff–Appellee before the ICA, argued that because she was the sole legal custodian, she had the sole right to determine how Minor should be disciplined.

8. Mother did not respond to this argument.

9. Mother did not respond to this argument.

10. On appeal, Mother had argued that because Petitioner qualified the ex parte petition as "bogus" and failed to attach the transcript of the show cause hearing, the only source of facts was

the court's findings and conclusions, which could not be deemed erroneous. Mother did not address Petitioner's argument on the merits. However, as noted, *infra*, after the ICA concluded that the appeal was moot, this court remanded for a decision on the merits. *See Hamilton v. Lethem*, 119 Hawai'i 1, 12, 193 P.3d 839, 850 (2008) [hereinafter, *Hamilton II*]. On remand, the ICA considered the transcript and the family court's findings and conclusions. *See Hamilton v. Lethem*, 125 Hawai'i 330, 341 n. 9, 347, 260 P.3d 1148, 1159 n. 9, 1165 (App.2011) [hereinafter, *Hamilton III*].

125 Hawai'i 330, 337–47, 260 P.3d 1148, 1155–65 (App.2011). As to Petitioner's contention that the process for obtaining an ex parte TRO was unconstitutionally gender-biased, the ICA found that Petitioner waived the point by failing to argue it. *See id.* at 347, 260 P.3d at 1165. Lastly, the ICA concluded that the court had not abused its discretion in issuing the TRO. The ICA found no clear error in the court's finding that Petitioner had struck Minor and ruled that it was "implicit in the [family court's] findings that [Petitioner's] actions were not reasonably calculated to promote Minor's welfare." *Id.* at 347–48, 260 P.3d at 1165–66.

## II.

Petitioner, now represented by counsel, lists the following questions in his Application:

1. When determining whether to issue a TRO, does the parental right to discipline children require the application of clear and articulable guidelines to distinguish truly abusive behavior from actions that are "moderate or reasonable discipline [that] is often part and parcel of the real world of parenting?"

2. When considering whether to issue a TRO, must the Family Court recognize that a non-custodial parent maintains a "residual parental right" to discipline his[/her] child during a period of unsupervised visitation, including the right to discipline the child for morals?

Respondent did not file a Response to the Application.

## III.

As to the first question, Petitioner contends that (1) parents have a fundamental right to discipline their children under the United States and Hawai'i constitutions that includes a right to employ corporal punishment; (2) the ICA incorrectly dismissed Petitioner's argument because it concluded that (a) the criminal statutory defense does not expressly apply in a civil setting, and (b) the definition of "domestic abuse" under HRS § 586–1 encompasses conduct that might oth-

erwise satisfy the parental discipline defense; (3) the only way for a parent to distinguish discipline from abuse is to have clearly established standards; (4) this court's interpretation of HRS § 703–309 protects the right to discipline, and for a parent's constitutionally protected right to discipline to mean anything, the same or a similar standard to the one used in the criminal law context must apply in the civil TRO context; (5) to protect a parent's right to discipline this court must interpret "domestic abuse" under HRS § 586–1 to be the "same or similar" [11] to the parental justification defense under HRS § 703–309; (6) the ICA gravely erred by failing to apply a discernible standard to distinguish discipline from abuse; (7) there is a potential due process violation because parents are left without notice as to what conduct constitutes abuse and courts will apply their own ad hoc sense of what the standards are; (8) the ICA simply assumed Petitioner's conduct rose to abuse and erred in not recognizing Petitioner's constitutional right to discipline.

As to the second question, Petitioner contends that (1) the ICA should have taken judicial notice of documents that established Petitioner's right to discipline his daughter; (2) the ICA's decision perpetuated the collateral consequences incident to the TRO because Petitioner's reputation was harmed by the ICA's decision; (3) the ICA's decision also hurt Petitioner because the court granted full custody of Minor to Mother as a result of the TRO; (4) the ICA erred in concluding that Petitioner did not have a right to discipline Minor; (5) it is well-established that parents with visitation rights retain authority to discipline their children during visitation.[12]

## IV.

█ It is now established that parents may discipline their children as part of the parents' liberty interest in the care, custody, and control of their children. "[T]he interest of parents in the care, custody, and control of

---

**11.** Petitioner's contention is read to mean that the same standard used to distinguish abuse from discipline under HRS § 703–309(1) should be used in HRS § 586–1.

**12.** Petitioner's arguments are presented in an order different from that in which Petitioner made them.

their children ... is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]." *In re Doe,* 99 Hawai'i 522, 532, 57 P.3d 447, 457 (2002) (citing *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). The Court has not been squarely presented with the question whether the right to care for children also includes a right to use corporal punishment to discipline them. *See Sweaney v. Ada County, Idaho,* 119 F.3d 1385, 1391 (9th Cir.1997) (holding that there is no clearly established federal constitutional right of a parent to inflict corporal punishment on a child). However, the Court has decided a number of cases that suggest it would recognize a parent's right to use corporal punishment. *See Troxel,* 530 U.S. at 65, 120 S.Ct. 2054 (plurality opinion) ("[T]he [constitutional] liberty [interest] of parents and guardians includes the right to direct the upbringing and education of children under their control[.] )" (internal quotation marks and citations omitted); *Parham v. J.R.,* 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children."); *Ingraham v. Wright,* 430 U.S. 651, 661, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (suggesting that parents are privileged to use force to discipline their children inasmuch as the Court observed that the prevalent rule in this country today permits teachers to use "such force as [the] teacher ... reasonably believes to be necessary for (the child's) proper control, training, or education") (internal quotation marks and citations omitted).

▮▮▮ Additionally, "Independent of the federal constitution ... parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article 1, section 5 of the Hawai'i Constitution." *In re Doe,* 99 Hawai'i at 533, 57 P.3d at 458. It is well-established that imposing discipline is part and parcel of caring for children, since a parent may not be able to care properly for, or exercise control over, an unruly child with-

out the ability to impose discipline. *See Ingraham,* 430 U.S. at 661, 97 S.Ct. 1401. Such discipline has included corporal punishment. *See id.* ("Professional and public opinion is sharply divided on the practice [of corporal punishment], and has been for more than a century. Yet we can discern no trend toward its elimination."); *State v. Crouser,* 81 Hawai'i 5, 14, 911 P.2d 725, 734 (1996) (explaining, for purposes of criminal liability, that it is "well-established," in Hawai'i, "that parents have a privilege to subject children to reasonable corporal punishment"). The right to discipline is therefore inherent in the right to care, custody, and control of one's children, as guaranteed by the Hawai'i Constitution.[13]

## V.

### A.

Preliminarily, the ICA distinguished the initial grant of the ex parte TRO from the show cause hearing. *Hamilton III,* 125 Hawai'i at 337–47, 260 P.3d at 1155–65. The ICA concluded that the procedures that permit a court to grant an ex parte TRO under chapter 586 comport with due process. *Id.* (citing, for example, *In re Guardianship of Carlsmith,* 113 Hawai'i 236, 239–40, 151 P.3d 717, 720–21 (2007)).

▮▮▮ When a petitioner first applies for a TRO ex parte, a court must find that there is probable cause to believe that "a past act or acts of abuse have occurred, or that threats of abuse make it probable that acts of abuse may be imminent." HRS § 586-4(c). Within fifteen days after the TRO is entered, a court is required to hold a show cause hearing to determine whether the TRO should remain in force. HRS § 586-5(b); *see Stylke v. Sotelo,* 122 Hawai'i 485, 491, 228 P.3d 365, 371 (App.2010) ("We hold that under HRS § 586-5(b), the court is obligated to hold a show-cause hearing on a TRO within fifteen days from the date the TRO is granted (where service has been effected) unless there is a substantial reason amounting to good cause for a delay."); *Kie v. McMahel,*

---

13. *Rights grounded in the Hawai'i Constitution may be broader in scope than rights grounded in the United States Constitution. See, e.g., State v. Dixon,* 83 Hawai'i 13, 23, 924 P.2d 181, 191

(1996) (stating that "article I, section 7 of the Hawai'i Constitution provides broader protection than the [F]ourth [A]mendment to the United States Constitution").

91 Hawai'i 438, 441–42, 984 P.2d 1264, 1267–68 (App.1999) (noting that under HRS § 586–5(b) the court must hold a show cause hearing no later than fifteen days from the date the TRO is granted). During that hearing, the petitioner has the burden to prove the allegations in the petition by a preponderance of the evidence. *Id.* at 442–43, 984 P.2d at 1268–69.

■■■■ The existence of exigent circumstances justifies dispensing with the requirement of holding a hearing before the ex parte TRO is granted. *Cf. In re Guardianship of Carlsmith,* 113 Hawai'i at 238–42, 151 P.3d at 720–23 ("TRO[s], in view of [their] emergency remedial nature, may [constitutionally] be granted ex parte[,]") ([alteration] in original,) (Citing *Luat v. Cacho,* 92 Hawai'i 330, 346, 991 P.2d 840, 856 (App.1999)). The availability of a prompt post-deprivation hearing (by way of a show cause hearing), combined with the fact that the petitioner retains the burden of proof during the hearing, ensures that the respondent's interests are adequately protected. *See id.* (upholding constitutionality of ex parte TROs issued under Hawai'i Family Court Rules Rule 65(b) where adverse party is allowed to request post-deprivation hearing); *Kie,* 91 Hawai'i at 442, 984 P.2d at 1268 ("While at that hearing the respondent must 'show cause why' the protective order is not necessary; HRS § 586–5.5(a), the burden remains on the petitioner to prove the petitioner's underlying allegations by a preponderance of the evidence."); *Coyle v. Compton,* 85 Hawai'i 197, 207, 940 P.2d 404, 414 (App.1997) (upholding issuance of an ex parte TRO in a domestic abuse situation against due process challenge). The ICA therefore correctly concluded that the procedure for obtaining an ex parte TRO under chapter 586 comports with due process. *See Hamilton III,* 125 Hawai'i at 337–47, 260 P.3d at 1155–65. Petitioner apparently does not quarrel with that conclusion in his Application.

### B.

Petitioner argues, however, that at the show cause hearing, there must be a standard by which courts can distinguish abuse from discipline. The ICA concluded that chapter 586 did not infringe upon Petitioner's right to discipline his children because that chapter only reaches abuse. *Id.* at 338–39, 260 P.3d at 1156–57. But the ICA did not articulate what differentiates abuse from discipline or what factors courts should consider in determining whether abuse or discipline is involved.

■■■■ Due process requires that the State provide meaningful standards to guide the application of its laws. *Cf. Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Statutes must be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited." *State v. Beltran,* 116 Hawai'i 146, 151, 172 P.3d 458, 463 (2007). Further, a law that "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis," carries "the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (U.S. 1972); *Beltran,* 116 Hawai'i at 153, 172 P.3d at 465 (2007) (same).

As Petitioner contends, without some way of distinguishing abuse from discipline, there is a danger that chapter 586 will infringe on the right to discipline by ensnaring parents who use corporal punishment properly to discipline their children, *see id.* at 151, 172 P.3d at 463 (explaining that laws must be sufficiently clear to allow the public to distinguish between lawful and unlawful conduct), and that parents, as a result, will refrain from disciplining their children for fear of being subject to a TRO, *cf. Brown v. Entm't Merchants Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 2743, 180 L.Ed.2d 708 (2011) (Alito, J., concurring) (explaining, in context of First Amendment challenge, that due process requires laws to give fair notice, and that vague laws compel people to "steer far wider of the unlawful zone ... than if the boundaries of forbidden areas were clearly marked") (internal quotation marks and citations omitted). Absent standards to guide courts in distinguishing discipline from abuse, there is also a risk that courts will apply chapter 586 arbitrarily. *See State v. Gaylord,* 78 Hawai'i 127, 138, 890 P.2d 1167, 1178 (1995) (explaining that a statute will not be held unconstitutional by reason of uncertainty if any sensible construction embracing the legislative purpose may be given to the statute).

## VI.

### A.

In the criminal law context, there is already a standard that our courts use to determine whether a parent has abused a child. HRS § 709–906(1) (1999) [14] prohibits "physically abus[ing] a family or household member." However, HRS § 703–309 can be raised as a justification or defense against a charge under HRS § 709–906. *See State v. Matavale*, 115 Hawaiʻi 149, 158–59, 166 P.3d 322, 331–32 (2007) (plurality opinion) ("When a question of parental discipline is raised, the prosecution must prove beyond a reasonable doubt that the parent's . . . conduct did not come within the scope of parental discipline as prescribed in HRS § 703–309(1).") As previously noted, under HRS § 703–309(1)(a) and (b), parents are permitted to use force against minor children so long as:

(a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and

(b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

HRS §§ 709–906 and 703–309(1) have withstood attack on the ground that they lack sufficient clarity as to the level of force that may be used to discipline a minor. *See State v. Stocker*, 90 Hawaiʻi 85, 95, 976 P.2d 399, 409 (1999); *Crouser*, 81 Hawaiʻi at 14–15, 911 P.2d at 734–35 (concluding that HRS §§ 703–309(1) and 709–906 are not unconstitutionally vague) (same). In *Crouser*, this court held that, "[a]lthough the legislature has not exhaustively enumerated the specific injuries that would constitute unjustified use of force[,] . . . HRS § 703–309(1) gives the person of ordinary intelligence" notice as to the conduct that is prohibited. 81 Hawaiʻi at 14–15, 911 P.2d at 734–35. Thus, "[t]he phrases

(1) reasonably related to the purpose of safeguarding or promoting the welfare of the minor, (2) designed to cause or known to create a risk of causing (3) substantial bodily injury, and (4) extreme pain or mental distress" were held to be "sufficiently precise" to give parents notice as to the amount of force that was considered excessive. *Id.* at 15, 911 P.2d at 735.

*Crouser* was reaffirmed in *Matavale*, which explained that "[i]n determining whether force is reasonable, the fact finder must consider the child's age, the child's stature, and the nature of the injuries inflicted." *Matavale*, 115 Hawaiʻi at 164, 166 P.3d at 338. In other words, the fact finder should consider "whether the force used was designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage given the child's age and size." *Id.*

This court acknowledged that these factors were "general in nature," "place[d] a large amount of discretion with the courts," and concluded there was no "bright line that indicates what, under all circumstances, is unreasonable or excessive corporal punishment." *Id.* at 165–66, 166 P.3d at 338–39. The permissible degree of force would depend on "the child's physique and age, the misconduct of the child, the nature of the discipline, and all surrounding circumstances." *Id.* This court's decisions would also provide guidance and would "serve to illustrate the kind of conduct that clearly falls outside the parameters of parental discipline." *Id.* at 164 n. 11, 166 P.3d at 337, n. 11; *see also State v. Kikuta*, 125 Hawaiʻi 78, 90, 253 P.3d 639, 652 (2011) (in determining whether a parent's use of force was justified under HRS § 703–309 the trier of fact must consider the child's physique and age, the misconduct of the child, the nature of the discipline, and all surrounding circumstances).

### B.

 The ICA rejected Petitioner's argument that he should be allowed to assert the

---

14. HRS § 709–906 provides in relevant part:
 § 709–906. Abuse of family or household members; penalty. (1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member or to refuse compliance with the lawful order of a police officer under subsection (4).

parental discipline justification under HRS § 703–309(1) as a defense to the TRO. *Hamilton III*, 125 Hawai'i at 339–40, 260 P.3d at 1157–58. The ICA explained that HRS § 703–309 does not expressly or implicitly extend to civil proceedings for domestic abuse. *Id.* The ICA implied that, in any event, the legislature intended for chapter 586 to cover acts that were otherwise privileged under 703–309(1). *Id.* ("The Legislature thus intended the definition of acts constituting domestic violence for purposes of TROs to be broader than those subjected to criminal liability under the penal code.").

█ It is true that the definition of "domestic violence" under HRS § 586–1 encompasses conduct broader in nature than the definition of physical abuse under HRS § 709–906. HRS § 586–1 also prohibits malicious property damage and threats of infliction of harm, injury, or assault. *See* HRS § 586–1. On its face, HRS § 709–906 does not apply to either kind of conduct. Therefore, the ICA was correct to point out that HRS § 586–1 reaches some conduct that is not criminalized under HRS § 709–906.

The ICA also explained that the purpose of a TRO is to prevent abuse rather than to punish past abuse. *See Hamilton III*, 125 Hawai'i at 340 n. 8, 346 n. 17, 260 P.3d at 1158 n. 8, 1164 n. 17. The aim of chapter 586 is to provide emergency relief from imminent harm by assuring a period of separation for the parties involved. *See id.* at 346 n. 17, 260 P.3d at 1164 n. 17 ("The Legislature has consistently affirmed the purpose of ex parte TROs to prevent imminent violence by 'assuring a period of separation of the parties involved.'") (quoting 1979 Haw. Sess. Laws, Act 168, § 1 at 345–46; S. Stand. Com. Rep. No. 3252, in 1998 Senate Journal, at 1314–15;

H. Stand. Com. Rep. No. 578–98, in 1998 House Journal, at 1264–65; HRS § 586–4(c)). The ICA was therefore also correct that the goal of chapter 586 may be different from that of HRS § 709–906.

█ However, as noted *supra*, the ICA also suggested that chapter 586 might extend to conduct for which a parent could otherwise assert the parental justification defense under HRS § 703–309. *See Hamilton III*, 125 Hawai'i at 340 n. 8, 260 P.3d at 1158 n. 8. Respectfully, the ICA was not correct to imply that chapter 586 prohibited conduct that would constitute discipline rather than abuse under HRS § 703–309. Otherwise, as Petitioner contends, "the right to discipline" would have no meaning. *See Crouser*, 81 Hawai'i at 14, 911 P.2d at 734 (stating that a parent has a "privilege to subject children to reasonable corporal punishment"). A parent would have the right to impose reasonable discipline in a criminal case, but could not raise the same justification in opposition to interference by the State with the parent-child relationship in a civil setting.[15] This would be an inconsistent result, one that the ICA has already rejected in the context of custody hearings. *See Rezentes v. Rezentes*, 88 Hawai'i 200, 206, 965 P.2d 133, 139 (App. 1998) (concluding that "the term 'family violence' in HRS § 571–46(9) (1993) would not extend to the type of physical discipline of a child by his or her parent that is expressly permitted in HRS § 703–309(1) [because] the legislature would [not] sanction in one statute the use of certain physical force ... and yet characterize in another statute the use of such force as family violence, potentially depriving a parent of custody or visitation.").[16]

### VII.

No standard has been announced in the civil law TRO context that is parallel to the

**15.** Further, it should be noted that although no criminal sanctions are imposed by a TRO, chapter 586 imposes criminal penalties for the violation of a TRO. HRS § 586–11 (knowing violation of protective order is a misdemeanor). The entry of a TRO could thus lead to criminal penalties.

**16.** The ICA contends that Rezentes is distinguishable in part because, as opposed to a custody determination "which is made after a full hearing of the issues" an "ex parte TRO is temporary in duration," "is intended to provide immediate

relief," and is based on "probable cause." *Hamilton III*, 125 Hawai'i at 340 n. 8, 260 P.3d at 1158 n. 8. However, the show cause hearing under HRS § 586–5 is one that affords "a full hearing on the issues." Moreover, to hold that proper discipline under HRS § 703–309(1) constitutes abuse under HRS 586–1 would blur the distinction between discipline and abuse and subject parents to inconsistent requirements for the same acts by making permissible conduct under HRS § 703–309(1) unlawful under HRS § 586–1.

criminal law area to assist the public and the courts in drawing the line between abuse and discipline. As noted above, chapter 586 defines "domestic abuse" as "physical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault, extreme psychological abuse or malicious property damage." HRS § 586–1. "Domestic abuse" is also defined as any act which would constitute an offense under HRS § 709–906. *Id.*

In some, and perhaps even in many, cases, the terms "physical harm," "bodily injury," and "assault" suffice to distinguish abuse from permissible discipline. Since any act that constitutes an offense under HRS § 709–906 also constitutes "domestic abuse" under HRS § 586–1, for all practical purposes, family courts may already be implicitly utilizing the factors set forth in HRS § 703–309(1) to distinguish abuse from discipline. A child's age, stature, the nature of the force, the nature of any injuries, and the proportionality of the punishment to the child's misconduct are the kinds of common sense considerations that a court might reasonably take into account in determining whether the force used by a parent amounts to abuse.

However, there is nothing in chapter 586 or in the decisions of this court expressly recognizing a parental right to employ discipline with respect to the show cause hearing under HRS § 586–5(b) on the question of whether the TRO should be continued. As noted before, in the absence of such a standard, courts may construe chapter 586 too broadly and, in doing so, violate a parent's constitutional right to discipline his or her child. *Cf. Rezentes,* 88 Hawai'i at 206, 965 P.2d at 139.

## VIII.

Petitioner asks this court to hold that a parent has a right to use reasonable force to discipline a child, and requests that we articulate a standard that family courts may apply in evaluating whether a parent's conduct amounts to abuse under chapter 586.24. The ICA did not squarely decide what standard should govern because it seemingly believed chapter 586 subsumed parental discipline permitted under HRS § 703–309.[17] *See Hamilton III,* 125 Hawai'i at 339–42, 260 P.3d at 1157–60 (stating that the legislature intended definition of acts constituting domestic violence to be broader than those subjected to liability under the criminal code). However, it is not necessary to import the express provision of HRS § 703–309(1) into HRS § 586–5 TRO show cause hearings.[18]

---

17. Although the ICA stated that the court "concluded that even if the defense [in HRS § 703–309] were available," Petitioner's "use of force was not reasonably related to safeguarding or promoting Minor's welfare," *see Hamilton III,* 125 Hawai'i at 341, 260 P.3d at 1159, the court seemed uncertain as to the scope of HRS § 586–1. While not entirely clear, it appears that during the hearing, the court believed that Petitioner was permitted to discipline Minor if she was involved in conduct that was particularly egregious, such as using illegal drugs, but that Petitioner could not discipline his daughter for other misbehavior. The court also thought that HRS § 703–309(1) was "relevant," but that Petitioner could not take advantage of it because Mother had sole legal custody of Minor. In contrast, in its written conclusions, the court stated that it was not "proper parental discipline" for Petitioner to strike his daughter for "her refusal to discuss [the birth control] issue late during a school night." The court also stated, however, that HRS § 703–309 "applies to criminal[,] not civil[,] actions." It cannot be said then that the court applied HRS § 703–309(1) in reaching its decision.

18. In oral argument, Respondent implied that HRS § 703–301(2) (1972) may prohibit a justification defense such as the parental discipline defense under HRS § 703–309 from being imposed in civil proceedings under HRS chapter 586. That section states that "[t]he fact that conduct is justifiable under this chapter [ (HRS chapter 703) ] does not abolish or impair any remedy for such conduct which is available in any civil action." HRS § 703–301(2). However, generally it would appear that HRS § 703–301(2) was intended to indicate that a justification defense does not affect remedies such as those that might flow from civil or private wrongs resulting in tort claims. *See* HRS § 703–301 cmt. ("For example, unreasonable conduct on the part of the defendant might suffice for civil liability whereas criminal liability will turn on the defendant's own subjective mental state.") (Emphasis added.) In any event, the right of parental discipline in the context of TRO proceedings stems from the constitution, not from the express provisions of HRS § 703–309.

## A.

Reasonableness is the standard that has long been employed by the states in the area of parental discipline. *See* Doriane Lambelet Coleman, et. al., *Where and How to Draw the Line Between Reasonable Corporal Punishment and Abuse*, 73–SPG Law & Contemp. Probs. 107, 137 (2010) [hereinafter, *Where and How to Draw the Line* ] ("[S]tates have long provided parents with an exception to tort and criminal-law prohibitions against physical assaults when they can establish a disciplinary motive for the assault and when the assault itself is 'reasonable.' Twentieth-century case law is thus replete with holdings like this one: 'A parent has the right to punish a child within the bounds of moderation and reason, so long as he or she does it for the welfare of the child.'") (citing cases); *see also* Restatement (Second) of Torts § 147 (1965) (based on survey of states, "[a] parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his child as he reasonably believes is necessary for [his child's] proper control, training, or education"); *G.C. v. R.S.*, 71 So.3d 164, 166 (Fla.App.2011) ("The common law recognize[s] a parent's right to discipline his or her child in a reasonable manner.") (internal quotation marks and citations omitted); *State v. Bell*, 223 N.W.2d 181, 184 (Iowa 1974) ("Parents have a right to inflict corporal punishment on their child, but that right is restricted by moderation and reasonableness."); *State v. Thorpe*, 429 A.2d 785, 788 (R.I.1981) ("[A] parent has a right to use reasonable and timely [corporal] punishment as may be necessary to correct faults in his/her growing children."); *Diehl v. Commonwealth*, 9 Va.App. 191, 385 S.E.2d 228, 230 (1989) ("It is settled in Virginia that while a parent has the right to discipline his or her child the punishment must be within the bounds of moderation."); *Where and How to Draw the Line*, 73–SPG Law & Contemp. Probs. at 117 n. 37 ("Even in states that lack physical-discipline exceptions within their family or juvenile-court codes, courts have recognized a parent's physical-discipline privilege based on a statutory privilege found in the criminal code or a common-law privilege.") (Citing *Lovan C. v. Dep't of Children & Families*, 86 Conn.App. 290, 860 A.2d

1283, 1288 (2004); *In re W.G.*, 349 N.W.2d 487, 487 (Iowa 1984)).

## B.

■■■ Reasonableness is also the standard used when considering whether a domestic violence injunction has been erroneously granted. *See G.C.*, 71 So.3d 164, 165–67. (holding that domestic violence injunction was not warranted because parents have a common law right to administer reasonable and non-excessive discipline and father's conduct was reasonable); *Simons v. State Dep't of Human Servs.*, 803 N.W.2d 587, 592–95 (N.D.2011) (holding in context of statute authorizing agency to remove abused children from homes that parents may use reasonable force to discipline their children); *see also P.W v. D.O*, 214 W.Va. 702, 591 S.E.2d 260, 265–67 (2003) (concluding that child was not "physically harmed" for purposes of obtaining temporary domestic violence order when parent spanked child but left no bruises).

## IX.

The formulations for determining whether a parent's conduct is reasonably related to discipline vary among the states, but they are more similar than not. Based on a survey of authorities, Restatement (Second) of Torts § 150 (1965) provides as follows:

In determining whether force or confinement is reasonable for the control, training, or education of a child, the following factors are to be considered:

(a) whether the actor is a parent;

(b) the age, sex, and physical and mental condition of the child;

(c) the nature of his offense and his apparent motive;

(d) the influence of his example upon other children of the same family or group;

(e) whether the force or confinement is reasonably necessary and appropriate to compel obedience to a proper command;

(f) whether it is disproportionate to the offense, unnecessarily degrading, or likely to cause serious or permanent harm.[19]

---

**19.** The factors are not exclusive. *See* Restatement (Second) of Torts § 150 (1965) cmt. a.

States consider essentially the same factors. For example, in Connecticut, "[i]n a substantiation of abuse hearing ... the hearing officer must determine whether the punishment was reasonable and whether the parent believed the punishment was necessary to maintain discipline or promote the child's welfare." *Lovan C.*, 860 A.2d at 1289. "The hearing officer must assess the reasonableness of the punishment in light of the child's misbehavior and the surrounding circumstances, including the parent's motive, the type of punishment administered, the amount of force used and the child's age, size and ability to understand the punishment." *Id.* Several other courts have identified similar circumstances, such as "the age, size, sex, and physical condition of both child and parent, the nature of the child's misconduct, the kind of marks or wounds inflicted on the child's body, the nature of the instrument used for punishment, etc." *State v. Singleton*, 41 Wash.App. 721, 705 P.2d 825, 827 (1985) (citing cases).

The factors considered by other states are coextensive with the test employed by Hawai'i in the context of the criminal parental discipline defense. We hold that the appropriate standard for family courts to apply in contested HRS chapter 586 show cause hearings is whether the parent's discipline is reasonably related to the purpose of safeguarding or promoting the welfare of the minor. In applying such a standard, the surrounding circumstances, including factors such as the nature of the misbehavior, the child's age and size, and the nature and propriety of the force used, have been universally considered and should also guide the courts in this state.

## X.

Petitioner argues that the court and the ICA improperly assumed that his actions constituted abuse. The ICA concluded that it was not an abuse of discretion, in light of the three incidents of abuse alleged, for the

court to conclude that abuse had occurred. However, in its findings and conclusions the court based its decision only on the single incident in which Minor alleged that Petitioner hit her "a couple of times" and that he was trying to slap her on the face but that she blocked his blows. None of the parties or the courts had the benefit of the standard for parental discipline to apply, as set forth *supra*, for purposes of the October 5, 2005 HRS § 586-5 show cause hearing. Accordingly, the case must be remanded to the court for application of that standard.[20]

## XI.

In his second question, Petitioner asks this court to determine whether a non-custodial parent has a residual parental right to discipline during unsupervised visitation.

### A.

Initially, Petitioner contends that the ICA erred in failing to take judicial notice of the documents pertaining to the custody case, UCCJ No. 98-0028. However, the ICA's refusal to take the custodial documents into account had no bearing on the ICA's decision because, as explained *infra*, the ICA refused to consider whether Petitioner retained a residual parental right to discipline Minor. *See Hamilton III*, 125 Hawai'i at 347 n. 20, 260 P.3d at 1165 n. 20.

Petitioner filed a motion with this court requesting that we take judicial notice of the custody case records. On December 7, 2011, we granted the motion with respect to Exhibit B (Ex B), titled "Stipulated Order for Post–Decree Relief Re Plaintiff's Motion and Affidavit for Post–Decree Relief Filed February 1, 1999, and Defendant's Motion and Affidavit for Post–Decree Relief Filed March 5, 1999," filed on September 22, 1999, and with respect to Exhibit A (Ex A), titled "Order Re Defendant's Motion for Post Decree Relief Filed on 4/26/02 and Plaintiff's Motion

**20.** It is not entirely clear whether the court concluded that Petitioner struck Minor for helping her friend in the birth control incident that Minor had already discussed with Mother, or instead because Minor was attempting to leave when Petitioner sought to speak to her. See discussion *supra*. In any event, whether the conduct by Petitioner was appropriate discipline in each incident should be left initially to the family court, inasmuch as those determinations are necessarily fact-bound, and will depend on the custodial arrangement of the parties and on the circumstances of the particular case.

for Post Decree Relief Filed on 5/17/02," filed on August, 27, 2003. Taking judicial notice of the custody documents establishes that Petitioner had visitation rights with Minor even though Mother had sole legal custody.

### B.

■ Petitioner also contends that his case is not moot. Although at this point Petitioner's daughter has reached the age of eighteen and the TRO has expired, as was the case when Petitioner was last before this court, "there is [still] a 'reasonable probability' that the family court's issuance of the TRO against [Petitioner], which was based on its findings and conclusions that [Petitioner] abused his daughter, will cause harm to [Petitioner's] reputation." *Hamilton II*, 119 Hawai'i at 11, 193 P.3d at 849 (rejecting contention that Petitioner's claim was moot after TRO expired and Mother was awarded full custody because Petitioner still had reputational interest to protect). Hence, Petitioner retains an interest in resolving whether the TRO should have been continued after the hearing.[21]

### C.

Petitioner argues that the ICA erred in agreeing with the court that Petitioner did not have the right to discipline Minor. However, the ICA did not reach the issue. The ICA stated:

> [Petitioner] also challenges the Family Court's conclusion that "discipline over issues of morals lies with [Mother], who has sole legal and physical custody." Given our ultimate conclusion that the Family Court did not abuse its discretion in issuing the Ex Parte TRO ... we need not address this point.

*Hamilton III*, 125 Hawai'i at 340 n. 6, 260 P.3d at 1158 n. 6. In her answering brief to the ICA, Respondent argued that HRS § 571–2[22] allows only the custodial parent to discipline the child, and does not permit the non-custodial parent to impose discipline. In oral argument, Respondent also referred to the provisions of the custody documents for this proposition.[23] Respondent argued that because the term "legal custody" is defined to include the responsibility to discipline, and the term "residual parental right" does not, a non-custodial parent with residual parental rights does not enjoy the right to discipline.

However, Respondent's argument was already considered and subsumed in *Stocker*, 90 Hawai'i at 93–94, 976 P.2d at 407–08. The *Stocker* court held that a " 'custodial' parent normally has reserved to him or her the sole authority and duty to 'discipline' a child," pursuant to HRS § 571–2. *Id.* This court

---

21. Petitioner also contends that "the ICA's errors perpetuated continuing collateral consequences" because during the pendency of the TRO, Mother was given sole legal and physical custody over Minor, which Petitioner was unable to modify because of the TRO. Because this court has already held that the reputational consequences of the grant of the TRO were sufficient to prevent the case from becoming moot, *see Hamilton II*, 119 Hawai'i at 11, 193 P.3d at 849, there is no need for this court to consider Petitioner's argument that the TRO also made it impossible for him to modify the award of custody to Mother.

22. HRS § 571–2 (1993) entitled "Definitions," provides in relevant part as follows:

> "*Legal custody*" means the relationship created by the court's decree which imposes *on the custodian the responsibility* of physical possession of the minor and the duty to protect, train, *and discipline the minor* and to provide the minor with food, shelter, education, and ordinary medical care, *all subject to residual parental rights and responsibilities and the rights and responsibilities of any legally appointed guardian of the person.*
> . . . .

> "*Residual parental rights* and responsibilities" means those rights and responsibilities remaining with the parent after the transfer of legal custody or guardianship of the person, *including, but not necessarily limited to, the right to reasonable visitation, consent to adoption or marriage, and the responsibility for support.*

(Emphases added.)

23. Respondent referred to provisions (1) in Ex A, which states that Respondent "shall have sole legal custody of the children," and that "[Respondent] shall consult with [Petitioner] on all legal custody decisions," and (2) in Ex B that "[for] major decisions ... the parties shall confer in unity ... including ... the manner in which the children shall be disciplined ... [and] the visitation schedule for [Petitioner]." On their faces, nothing in these provisions governed the particular circumstances of the events of August 25, 2005, nor directly conflicted with the provision under HRS § 571–2, that Petitioner "retain[ed] as a 'residual parental right,' ... the authority to discipline a child with respect to that child's conduct during the visitation period." *Stocker*, 90 Hawai'i at 94, 976 P.2d at 408.

recognized that the definition of "residual parental rights" in HRS § 571–2 did not expressly include the right to discipline, but explained that the rights listed in the definition were not exclusive. *Id.* Therefore, *Stocker* held that a non-custodial parent, "acting within his court-prescribed unsupervised visitation time, retains [a] 'residual parental right' ... to discipline a child with respect to that child's conduct during the visitation period." *Id.* at 94, 976 P.2d at 408 (internal citation omitted). Consequently, "[a] contrary holding would lead to the absurdity that a non-custodial parent, alone with his child during an authorized visitation period, would be powerless to employ the use of force against the child, even if such force were reasonably necessary to 'promote' the child's 'welfare.'" *Id.*

■■■■■ *Stocker* was decided in the context of the parental discipline defense under HRS § 703–309(1), but the rationale applies equally here. It would be inconsistent to say that a non-custodial parent retains the right to use reasonable force to discipline a child for purposes of a criminal prosecution but not for purposes of a civil proceeding. Parents with visitation rights are responsible for

the supervision of their children while the child is with them. *See id.* Consequently, the responsibility to supervise must also include the ability to discipline the child when the child is in the physical custody of the parent—whether the parent has full legal custody or visitation rights. *See id.* In this case, no party before the court disputed that Petitioner had visitation rights with Minor. Yet the court was unsure of whether Petitioner had the right to discipline Minor. We *conclude that a non-custodial parent retains the right to discipline his or her child for conduct that occurs while the child is under the supervision of the noncustodial parent.*[24]

## XII.

For the foregoing reasons, we vacate the September 21, 2011 ICA judgment and the court's October 5, 2005 Order Regarding Temporary Restraining Order. We remand the case to the court for application of the standard for parental discipline consistent with this opinion.

---

**24.** However, the family court retains discretion in any particular case to specifically prohibit corporal punishment by a non-custodial parent as the circumstances may reasonably warrant.